**AMERICAN ARBITRATION ASSOCIATION**
**Case No. 01-21-0016-3751**

| | |
|---|---|
| PURPLE INNOVATION, LLC, | ) |
| | ) |
|      Claimant and Cross-Respondent, | ) |
| | ) |
|      vs. | ) |
| | ) |
| RESPONSIVE SURFACE TECHNOLOGY, | ) |
| LLC; PATIENTECH, LLC; and ROBERT | ) |
| GOLDEN, | ) |
| | ) |
|      Respondents and Counterclaimants. | ) |
| | ) |
| _____ | ) |

**INTERIM AWARD ON LIABILITY AND DAMAGES**

## **TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ................................................................. 4

I.    THE PARTIES AND NATURE OF THE CASE ............................................. 7

II.   PROCEDURAL HISTORY ................................................................. 8

III.  THRESHOLD ISSUE: WHICH SIDE, IF ANY, IS AT FAULT FOR THE END
      OF THE PARTIES' RELATIONSHIP? ................................................. 13

      A.    The January 2020 MSA ........................................................ 14

      B.    The 2020 Purple-Enhanced ReST Bed and March 2020 Modification of the
            MSA ......................................................................... 16

      C.    The July 2020 Launch of the Purple-Enhanced ReST Bed, August 2020
            Termination Notice, and Breakdown in the Relationship ........................ 20

      D.    Was Either Side at Fault for the Termination? .............................. 23

IV.   ANALYSIS OF PURPLE'S CLAIMS ....................................................... 24

      A.    Purple's Claim for Wrongful Termination and Return of its ██████████
            ██████ ...................................................................... 24

            1.   ReST's August 11 Notice of Termination .............................. 26

            2.   Termination Due to Late Revenue Share Payments ...................... 27

            3.   Termination Based on Breach of Due Diligence Obligations ............ 29

      B.    Purple's Claim for Revenue Share Payments ................................. 30

      C.    Purple's Trademark Infringement Claim for the Pre-TRO Period ............... 34

            1.   The Parties' Positions Regarding Purple's IP Claims ................. 35

            2.   Purple's IP Claims against PatienTech ............................... 36

            3.   ReST's Infringement of Purple Trademarks During the Pre-TRO Period .. 36

            4.   Damages for ReST's Trademark Infringement for the Pre-TRO Period .... 39

            5.   Enhanced Damages and Punitive Damages .............................. 44

      6.  Personal Liability of Respondent Golden .................................................... 45

   D.  Purple's Trade Dress Infringement Claim for the Post-TRO Period ................ 46

      1.  Does Purple have trade dress rights in a purple-colored grid? ................... 47

      2.  Has Purple shown that ReST's use of a purple-colored grid creates likely confusion? ........................................................................................................ 51

      3.  Personal liability of Respondent Golden ..................................................... 54

      4.  What damages should be awarded for ReST's infringement of Purple's trade dress? ................................................................................................................ 54

   E.  The Parties' Claims and Counterclaims for Interest ........................................... 55

V.   ANALYSIS OF ReST AND PATIENTECH'S COUNTERCLAIMS ............................. 56

   A.  Counterclaims for Fraud and Negligent Misrepresentation ............................... 56

      1.  Deal Would Close Unless ReST Got Greedy or Changed its Terms ........... 56

      2.  Status of Due Diligence ................................................................................ 58

      3.  Purple's Plans Regarding the 2020 Purple-Enhanced ReST Bed ............... 59

   B.  Counterclaim Based on the Ad Spend Agreement ............................................. 61

   C.  Counterclaim for Unreimbursed Consulting Services ....................................... 62

VI.  DISPOSITION AND SCHEDULE FOR FURTHER SUBMISSIONS .......................... 63

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| **2020 Bed** | ███████████████████████████████████ |
| **AAA** | American Arbitration Association |
| **AAA Rules** | Commercial Arbitration Rules of the American Arbitration Association, effective October 1, 2013 |
| **April 9 Email** | Internal Purple email that was inadvertently copied to ReST and PatienTech on April 9, 2020 (Exhibit 36; also called the "smoking gun" email) |
| **Arbitrator** | Grant L. Kim |
| **CES Bed** | ███████████████████████████████████ |
| **Claimant (or Purple)** | Claimant Purple Innovation, LLC ("**Claimant**" or "**Purple**") |
| **Exclusivity Period** | ███████████████████████████████████ |
| **go/no go decision** | Decision to proceed or not proceed with the Proposed Transactions, which the two CEOs agreed in that March 2020 Modification that they would try to reach by the summer of 2020 |
| **Hoffman Expert Report** | May 12, 2023, Expert Witness Report of Richard Hoffman |
| **IP Claims** | Purple's related claims arising from Respondents' alleged use of Purple's trademarks and trade dress and "overselling" (or "bait-and-switch") conduct. " |
| **March 2020 Modification** | The supplemental agreement that Purple, ReST, and PatienTech entered into in March 2020, acting through their CEOs, which modified and supplemented the MSA. |

| Abbreviation | Description |
|---|---|
| **March 3 Email** | Email that Respondent Golden allegedly sent on March 3, 2020, which is actually an altered version of a different email sent on May 5, 2020 |
| **MSA** | Master Vendor Supply and Services Agreement entered into as of January 13, 2020 (Exhibit 1) |
| **Parties** | Claimant and Respondents, collectively |
| **PatienTech** | Respondent PatienTech LLC |
| **Pre-TRO Period** | The period from August 11, 2020 (MSA termination) until December 13, 2020 (ReST stopped use of Purple trademarks in response to TRO) |
| **Post-TRO Period** | December 14, 2020 (ReST stopped use of Purple trademarks after TRO) until August 2, 2021 (ReST's last use of purple grid image) |
| **Proposed Transaction** | ███████████████████████████████ |
| **Purple (or Claimant)** | Claimant Purple Innovation, LLC |
| **Purple-Enhanced ReST Bed** | ███████████████████████████████ |
| **Purple Grid** | Purple-colored gel grid or topper that is the key component of the Purple bed and which was included in the Purple-Enhanced ReST Bed |
| **Purple's August 10 Notice** | Mr. Megibow's August 10, 2020, oral notice to Mr. Golden that the Purple Board had decided not to proceed with the Proposed Transaction |
| **Purple's Confirmation of Claims** | Confirmation of Purple's Claims, submitted by Purple on July 28, 2023 |
| **Purple's Elements of Claims** | Purple's August 8, 2023 Submission of Elements of Claims and Additional Authorities |
| **Purple's Opening Post-Hearing Brief** | Claimant's September 22, 2023, Post-Hearing Additional Authorities and Materials |
| **Purple's Post-Hearing Opposition** | Claimant's October 12, 2023, Opposition to ReST's Post-Hearing Brief |

| Abbreviation | Description |
|---|---|
| **Purple's Pre-Hearing Brief** | Purple's Pre-Hearing Brief of July 17, 2023 |
| **Respondents** | Respondents ReST and PatienTech (and Respondent Robert Golden, where relevant) |
| **Respondents' Opening Post-Hearing Brief** | Respondents' September 22, 2023, Opening Post-Hearing Brief |
| **Respondents' Opposition to Post-Hearing Brief** | Respondents' October 12, 2023, Opposition to Purple's Post-Hearing Brief |
| **Respondents' Pre-Hearing Brief** | Respondents' Pre-Hearing Brief of July 17, 2023 |
| **ReST** | Respondent Responsive Surface Technology, LLC |
| **ReST + Purple** | ███████████████████████████ |
| **ReST Bed + ReST GelGrid** | ███████████████████████████ |
| **ReST's August 11 Notice of Termination** | The Notice of Termination that Mr. Golden sent to Mr. Megibow on August 11, 2020 |
| **Revenue Share** | ███████████████████████████ |
| **SOW** | Statement of Work attached to the MSA |
| **Vendor** | ReST and PatienTech (as defined in the MSA) |

I, THE UNDERSIGNED ARBITRATOR ("**Arbitrator**"), having been designated in accordance with the arbitration agreements in the Master Vendor Supply and Services Agreement entered into as of January 13, 2020 ("**MSA**"), by Claimant Purple Innovation, LLC and Respondents Responsive Surface Technology, LLC; and PatienTech LLC, as further described below, and having duly heard the proofs and allegations of the parties, do hereby issue this INTERIM AWARD as follows:

## I.    THE PARTIES AND NATURE OF THE CASE

1.    This dispute arises from a business deal that went sour.  Claimant Purple Innovation, LLC ("**Claimant**" or "**Purple**") sells mattresses that include its purple-colored gel grid or topper (the "**Purple Grid**").  Purple is a fairly large company with substantial name recognition.

2.    Respondent Responsive Surface Technology, LLC ("**ReST**") sells high-end "smart beds" that use technology developed by its parent, Respondent PatienTech LLC ("**PatienTech**"), which adjusts the mattress automatically in response to the movements of the sleeper.  ReST is a much smaller company than Purple.

3.    Respondent Robert Golden is the CEO of both ReST and PatienTech.  Purple has named him as a respondent solely for its claims related to infringement of its trademarks and other intellectual property rights.  Mr. Golden did not sign the MSA and is not a party to the other claims or counterclaims.  Thus, "Respondents" includes Mr. Golden only in contexts where he is relevant. It is limited to ReST and PatienTech in the context of the MSA and contract claims.

4.    Claimant and Respondents (collectively, the "**Parties**") are well aware of the underlying facts and the lengthy procedural history.  Accordingly, this Section I and the following Section II highlight key points only.  Additional facts are set forth in the relevant part of the following analysis of the claims, counterclaims, and defenses.

5.    In 2019, Purple approached Respondents about buying or licensing their adjustable bed technology, so that it could develop new self-adjusting smart beds that include Purple Grids.

6.    In January 2020, Purple, ReST, and PatienTech agreed in the MSA to continue discussions for the next year about a possible acquisition or other business combination, on an exclusive basis, while Purple conducted due diligence.  They also agreed to work on developing a smart bed that combined the Purple Grid with ReST's self-adjusting mattress technology.  Purple agreed to pay ██████████████, some or all of which could be credited or returned to Purple under conditions specified in the MSA.

7. 

8.

9.     On July 1, 2020, ReST launched the Purple-Enhanced ReST Bed and proceeded to market and sell it.

10.    On August 10, 2020, Purple CEO Joe Megibow informed ReST CEO Robert Golden that Purple's Board of Directors had decided that Purple would not acquire ReST or its technology. Mr. Golden sent Mr. Megibow a notice of termination on the following day, ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11.    Mr. Megibow, Mr. Golden, and their colleagues exchanged further communications, but were not able to resolve the dispute.

12.    In October 2020, both Purple and ReST filed lawsuits in Utah District Court.  On December 11, 2020, the Utah District Court entered a TRO that required ReST and PatienTech to stop using the Purple name, brand, trademarks, and other intellectual property, as well as the marketing and sale of the ReST + Purple bed, by no later than midnight of Monday, December 14, 2020.  (Ex. 3.)  On December 18, 2020, the Utah District Court entered a preliminary injunction that reiterated and extended the terms of the TRO, which was effective for 14 days only.  (Ex. 4.)

13.    Purple filed this arbitration in September 2021, as further described below.

## II.    PROCEDURAL HISTORY

14.    On September 1, 2021, Purple filed a Demand for Arbitration with the American Arbitration Association ("**AAA**") against Respondents ReST, PatienTech, and Robert Golden. Purple claimed that Respondents had breached their obligations under the MSA in multiple respects, including by failing to return ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Purple also claimed that Respondents had violated its IP rights.  Purple sought damages of at least $5 million, plus interest, attorneys' fees, arbitration costs, and punitive damages.

15.     Respondents filed their Answer on September 21, 2021.  Respondents denied Purple's claims and asserted counterclaims for breach of contract, misappropriation of trade secrets, unjust enrichment, tortious interference with contract, fraud, negligent misrepresentation, promissory estoppel, and unfair competition.  Respondents sought damages of at least $50 million, plus interest, attorneys' fees, arbitration costs, and punitive damages.

16.     On October 12, 2021, Purple filed a Statement of Claim that explained its claims in more detail.  Purple asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, trademark infringement (both Lanham Act and common law), trade dress infringement and false advertising (Lanham Act), unfair competition and deceptive trade practices (federal and Utah statutes and common law), and patent infringement.

17.     The AAA invited me to serve as sole Arbitrator on October 28, 2021.  The AAA confirmed my appointment as sole Arbitrator on November 8, 2021, after no party objected to disclosures that I had made.

18.     A preliminary hearing was initially scheduled for December 1 and was moved to December 21, 2021, in response to the Parties' joint request.  After the preliminary hearing and an exchange of emails with draft schedules, I issued Procedural Order No. 1 on January 19, 2022, which confirmed the following points:

a.   Utah substantive law and the Federal Arbitration Act apply.

b.   The procedures are governed by the AAA Commercial Arbitration Rules, effective October 1, 2013 (the "**AAA Rules**"), and by the procedural orders and other directions issues by the Arbitrator.

c.   The place and legal seat of arbitration is the area of Lehi, Utah.

d.   The Parties have reviewed the Arbitrator's disclosures and have no objection to the appointment of the Arbitrator.  The Parties also have no objections to arbitral jurisdiction.

19.     Procedural Order No. 1 also attached a Table of Deadlines, which set dates for discovery, disclosures, motions, and pre-hearing submissions, and scheduled the final merits hearing for November 29 to December 9, 2022.

20.     The Table of Deadlines was revised multiple times by subsequent procedural orders. Those revisions postponed the final merits hearing to July 31 to August 11, 2023.

9

21.     Purple has been represented throughout this arbitration by James Magleby, Adam Alba, and others at the law firm of Magleby, Cataxinos & Greenwood, PC.

22.     Respondents were initially represented by the law firm of Snell & Wilmer.   On March 10, 2023, Snell & Wilmer provided notice that Utah ethical rules required it withdraw as counsel.

23.     On March 24, 2023, Stephen Horvat of the law firm of Anderson & Karrenberg provided notice that his firm would be representing Respondents.   Mr. Horvat and his colleagues have continued to represent Respondents since then.

24.     A large number of procedural orders were issued to resolve other disputes. Excluding orders on discovery and schedule, other significant orders include:

- Procedural Order No. 8 (January 27, 2023):   Granted Respondents' motion to amend their counterclaims in part, and denied the motion in part.

- Procedural Order No. 19 (May 4, 2023): Denied Purple's Motion for Leave to File Dispositive Motions.

- Procedural Order Nos. 20, 23, and 25 (May 4, June 15, and June 29, 2023):  Issued relief related to Purple's Motion for Sanctions.

- Procedural Order Nos. 26 and 28 (June 30 and July 13, 2023): Denied the Parties' motions to exclude expert testimony.

25.     Purple's Motion for Sanctions is especially significant.   As explained in Procedural Order No. 20, Purple asserted that forensic analysis showed that Respondents' principal, Robert Golden, produced a fake email dated March 3, 2020 (the "**March 3 Email**"), which was an altered version of an email actually sent on May 5, 2020.   In view of Respondents' reliance on this fake evidence and related false testimony, Purple sought imposition of the following sanctions:

- Dismissal of all of Respondents' counterclaims with prejudice;

- An award of liability on Purple's claims, subject to proof as to the amount of damages; and

- An immediate order "finding Purple is entitled to its fees and costs incurred in bringing this motion and investigating ReST's improper conduct, to be immediately payable but without prejudice to Purple's request for all fees."

26.    Procedural Order No. 20 ordered Respondents to show cause why the sanctions sought be Purple should not be imposed and also requested Purple to address several issues.

27.    As noted in Procedural Order No. 25, Respondents replied that they did not dispute that the email was fake.  Respondents agreed that "some sanctions" were appropriate and stated that they were withdrawing their counterclaims related to the fake email, including their counterclaim for breach of an oral supply agreement, as well as any related portion of their claim for breach of the implied covenant.  Respondents asserted, however, that it would not be appropriate to enter an award in favor of Purple on Purple's claims and Respondents' other counterclaims, as they were not related to the March 3 Email.

28.    Pursuant to Procedural Order No. 23, Respondents submitted a formal motion to withdraw counterclaims and allegations that specified the counterclaims and allegations that they were withdrawing.  Purple submitted a statement of the fees and costs it had incurred in connection with its Motion for Sanctions.

29.    On June 29, 2023, I issued Procedural Order No. 25, which granted Purple's Motion for Sanctions in part, and granted Respondents' motion to withdraw counterclaims and allegations. My rulings included:

- Respondents deliberately created and relied on fake evidence and deliberately provided false deposition testimony, which is gross misconduct that warrants the imposition of sanctions.

- All counterclaims and allegations related to the fake evidence were stricken;

- Respondents are ordered to make immediate payment to Purple of $58,362 by no later than July 7, 2023, to cover fees and costs incurred by Purple that are related to the fake evidence and Respondents' misconduct;

- Mr. Golden shall appear at a deposition regarding the creation of the fake March 3 Email and related issues, including (but not limited to) the extent to which other persons assisted in that creation or knew that the email was fake, and the extent to which any other fake evidence has been created in connection with this arbitration;

- Respondents shall confer in good faith with Purple about other reasonable measures to ensure that Purple receives sufficient information to evaluate the credibility of other ReST witnesses and the extent to which other fake evidence was created.

30.    I did not grant Purple's requests to rule for Purple on its claims or to dismiss Respondents' other counterclaims, but reserved "the power to impose other sanctions and to grant other relief in the future, if I conclude that this is warranted."

31.    On July 2, 2023, Respondents filed an Amended Statement of Counterclaims, which dropped the counterclaim and allegations that Respondents had withdrawn and also dropped their counterclaims for trade secrets, tortious interference with contract, and unfair competition.  As a result, Respondents' remaining counterclaims included (1) Breach of Ad Spend Agreement; (2) Unjust Enrichment; (3) Fraud; (4) Negligent Misrepresentation; and (5) Promissory Estoppel.

32.    The Parties filed concurrent prehearing briefs on July 17, 2023.  On July 28, 2023, Purple submitted a "Confirmation of Purple's Claims" ("**Purple Confirmation of Claims**"), which stated that Purple was not pursuing its claims for patent infringement or its contract claims based on Respondents' sale of products to third parties or their supplying ███████  Purple confirmed that it is pursuing its other breach of contract theories, such as wrongful termination of the MSA, return of Purple's ████████  initial investment, and failure to make Revenue Share payments.  Purple also confirmed that it is pursuing its claims for trademark and trade dress infringement and related theories of unfair competition and false advertising.

33.    The merits hearing took place in Salt Lake City, Utah, during the ten business days from July 31 to August 11, 2023.  Both sides had the opportunity to examine numerous fact and expert witnesses.  Most testimony was live, but a few examinations were conducted remotely, pursuant to the Parties' agreement.  The Parties also agreed to submit deposition transcripts of some witnesses in lieu of live testimony.

34.    The hearing began with opening statements and concluded with a full day of closing arguments.  During the hearing, both sides submitted summaries of the elements of their claims and counterclaims, with legal authorities.  (Purple's August 8, 2023, Submission of Elements of Claims and Legal Authorities; Respondents' August 8, 2023-Pre-Hearing Brief Supplement.)

35.    Pursuant to the Parties' request, I explained my preliminary views on the claims and counterclaims on the day before closing arguments.  I emphasized that my comments were preliminary only and primarily for the purpose of providing feedback so that counsel could decide

what issues to focus on during closing arguments.  Counsel for both sides confirmed that they had no objections to this procedure.  (Day 9 Hearing Transcript at 134:24 to 135:21.)

36.     After closing arguments, the Parties agreed to the schedule for post-hearing submissions in Procedural Order No. 29, which was later revised by Procedural Order No. 30. That schedule includes concurrent Opening, Opposition, and Reply post-hearing briefs on each side's claims and counterclaims.  At the Parties' request, I agreed to issue an initial Partial Award on liability, damages, and interest, which would be followed by submissions on allocation of fees and costs and a Final Award on all issues, including fees and costs.

37.     The Parties confirmed at the end of the hearing that they had no complaints about the way the procedures were conducted.  They also confirmed that with the exception of Purple's argument about pleading defects, they had a reasonable opportunity to present their case.  (Day 10 Hearing Transcript, 260:21 to 261:11.)

38.     The Parties submitted post-hearing briefs in accordance with the schedule in Procedural Order No. 30.  On October 20, 2023, I confirmed receipt of the post-hearing briefs and requested the Parties to let me know by October 23 if they sought leave to make any further submissions.  No such request was made, so I closed the hearing on October 25, 2023.

39.     On November 16, 2023, the AAA extended the deadline to issue the Interim Award from November 27 to December 27, 2023, pursuant to a request from the Arbitrator and the consent of the Parties.

## III.     THREHOLD ISSUE: WHICH SIDE, IF ANY, IS AT FAULT FOR THE END OF THE PARTIES' RELATIONSHIP?

40.     This Section III analyzes the overarching issue of which side, if any, is at fault for the breakdown in the Parties' business relationship.  This issue requires an understanding of how the deal evolved, including the important modification that the Purple and ReST CEOS agreed to in March 2020.  I begin with this issue because it has a significant impact on the Parties' claims, counterclaims, and defenses.

41.     After discussing this threshold issue, I analyze Purple's Claims in Section IV and Respondents' counterclaims in Section V.

A.     The January 2020 MSA

42.     As noted above, ███████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ .

43.     On January 10, 2020, ███████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████

44.     Purple CEO Joe Megibow agreed to Mr. Golden's proposal, which became the basis for the MSA that Purple, ReST, and PatienTech signed on January 13, 2020.  The MSA and attached Statement of Work ("**SOW**") include the following key terms.

45.     *First*, Purple, ReST, and PatienTech agreed ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████

46.     *Second*, Purple, ReST, and PatienTech agreed ██████████████████
████████████████████████████████████████████████

47.     *Third*, Purple, ReST, and PatienTech agreed ██████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

- ███████████████████████████████████████████████
  ███████████████████████████████████████████████
  ███████████████████████████████████████████

14

- ██████████████████████████████████████
  ██████████████████████████████████████
  ███████████

- ██████████████████████████████████████
  ██████████████████████████████████████
  ███████████████████████████████

(MSA, §§ 11.6, 11.7.)

48.   ***Fourth***, the MSA required ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████

49.   ***Fifth,*** the MSA entitled █████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

50.   ***Sixth***, the MSA stated: ████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

51.   ***Seventh***, the MSA required █████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

15

██████████████████████████████████████████████████████████
████████████████████████████████████

52.    In sum, the MSA provided ████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████ █████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████

53.    The MSA made clear ██████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
███████████████████████

**B.    The 2020 Purple-Enhanced ReST Bed and March 2020 Modification of the MSA**

54.    The MSA contemplated ████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
█████████████████████████████

55.    Shortly after the MSA was signed, Purple proposed that ████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████

56.    On February 27, 2020, Mr. Golden and Mr. Megibow discussed ReST's concerns about ████████████████████████████████████████ On the same date, Mr. Golden sent the following summary of this call:

Here is what I took away from our call:

- ████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████.

16



or

Please confirm that your understanding is the same as ours in this matter.

(Ex. 223, Email of February 27, 2020 from Robert Golden to Joe Megibow.)

57.    On March 3, 2020, Mr. Megibow replied that  Mr. Megibow stated:



(Ex. 1013, Email of March 3, 2020 from Joe Megibow to Robert Golden.)

58.    Mr. Golden replied on the same date as follows:



(Ex. 1013, Email of March 3, 2020 from Robert Golden to Joe Megibow.)

59.    Thus, Mr. Megibow agreed in full with the first half of Mr. Golden's February 27 summary of the discussion between the two CEOs.  Mr. Megibow added some comments about to the second half, but did not specifically disagree.  Further, Mr. Golden agreed with Mr. Megibow that all of the proposed alternatives were ▮▮▮▮▮  Thus, the two CEOs appear to have reached consensus on the points covered by the February 27 and March 3 emails.

60.    During the merits hearing, I expressed the preliminary view that Purple, ReST, and PatienTech, acting through their CEOs, entered into a supplemental agreement in March 2020, which modified and supplemented the MSA (the "**March 2020 Modification**"; *see* Day 9 Hearing Transcript at 143:23 to 147:25).  The key terms include:

18



61.   At the merits hearing, I also noted that Section 12.5 of the MSA states ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

62.   The Parties did not dispute in their closing arguments or post-hearing briefs my preliminary view that in March 2020, the Parties agreed to modify and supplement the MSA as noted above.  They also did not dispute that the emails discussed above are sufficient to meet the requirement that any modification of the MSA be in writing.  In fact, the two CEOs agreed with my summary of the March 2020 Modification, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮   (Day 1 Hearing Tr. at 310:6 to 314:15, 320:15 to 324:11 (Megibow); Day 3 Hearing Tr. at 101:21 to 107:5 (Golden); Day 7 Hearing Tr. at 259:18 to 260:22 (Golden).  Accordingly, I find that in March 2020, the Parties agreed to modify the MSA as set forth above.

### C. The July 2020 Launch of the Purple-Enhanced ReST Bed, August 2020 Termination Notice, and Breakdown in the Relationship

63. On July 1, 2020, ReST publicly announced that it would be selling the Purple-Enhanced ReST Bed. (Ex. 72.)

64. On August 5, 2020, ████████████████████████████
████████████████████████████████████████████████



(Ex. 123 at 3.)[1]

65. On August 10, 2020, ████████████████████████████
████████████████████████████████████████████ Mr.
Golden sent Mr. Megibow an email later that day, stating that he was ███████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████ (Ex. 1032.002.)

66. Mr. Golden requested that Craig Phillips call him to discuss ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████



---

[1] Purple designated the Board meeting minutes as Attorneys' Eyes Only ("AEO"). I believe that the limited references to AEO documents herein do not raise any significant issues, but the Parties should advise of any concerns within ten days of receipt of this Interim Award.



(Ex. 1032.002 (emphasis added).)

67.     On August 11, 2020, Mr. Golden sent Mr. Megibow a "Notice of Termination" ("**ReST's August 11 Notice of Termination**").  He claimed that Purple had materially breached the MSA by terminating discussions of the Proposed Transaction on August 10.  Mr. Golden asserted that this breach was incurable, so Section 10.2.2 entitled ReST and PatienTech to terminate the MSA immediately.[2]  (Ex. 1034.001-.002.)

68.     Mr. Golden then proposed that the Parties enter into agreements regarding Revenue Share payments to Purple, and Purple's supply of grids to Respondents.  (Ex. 1034.002-.003.)

69.     On August 11, Mr. Megibow sent Mr. Golden a short reply, stating that he would provide a formal response after further review.  (Ex. 1034.001.)  Mr. Megibow sent his formal response on August 24, 2020.  Key points included:

- ██████████████████████████████████████████
  ████████████████

- ██████████████████████████████████

- ██████████████████████████████████████████
  ████████████████████████████████████████

---

[2]  Mr. Golden also asserted that Purple breached MSA Section 11.7 by claiming that Board approval was required.  ReST stated at the hearing, however, that it knew Board approval was required and is not pursuing this argument.  Thus, I need not consider that argument.



(Ex. 16 at 1-2.)

70.    The Parties engaged in further communications in August and September 2020, but were not able to resolve their disputes.

71.    On October 13, 2020, Purple filed a complaint in Utah District Court against ReST and PatienTech (collectively, "Defendants").  Purple claimed that Defendants had breached the MSA in multiple respects and that Defendants were infringing Purple's trademarks "if the MSA is terminated."  (Ex. 19, ¶¶ 72, 75-89.)

72.    On October 20, 2020, ReST filed its own complaint in Utah District Court against Purple, Mr. Megibow, and other members of the Purple Board.  ReST asserted claims that are similar to its original counterclaims in this arbitration, but that were also directed against the Purple Board.  (Ex. 20.)

73.    Purple subsequently requested the District Court to enjoin Defendants from infringing Purple's trademarks.  In December 2020, the Utah District Court entered a TRO and then a preliminary injunction, which prohibited ReST and PatienTech from using the Purple name,

brand, and trademarks, and required them to cease the marketing and sale of the ReST Bed with Purple Topper, and of any product that used any Purple product.  (Ex. 3, TRO of December 11, 2020; Ex. 4, Preliminary Injunction of December 18, 2020.

74.    In sum, after ReST launched the Purple-Enhanced ReST Bed in July 2020, Purple informed ReST in August 2020 that it had decided not to pursue the Proposed Transaction.  That decision led to disputes that the Parties were unable to resolve.  Both sides filed court lawsuits in October 2020, which resulted in entry of a TRO and a preliminary injunction against ReST and PatienTech.

### D.    Was Either Side at Fault for the Termination?

75.    I expressed the preliminary view at the hearing that neither side was "at fault" for the breakdown in the Parties' relationship, in view of the March 2020 modification of the MSA. The key point is that the Parties agreed in March 2020 that they would determine whether the Proposed Transaction would proceed by the summer of 2020, instead of continuing to negotiate until January 2021.  (Day 9 Hearing Transcript at 145:24 to 151:18.)

76.    Pursuant to the March 2020 modification, the Proposed Transaction would proceed if the Parties  agreed by the summer of 2020 that the deal was a "go" and should be completed.  In contrast, if no such agreement was reached, then either side had the option to call off the deal and to stop further negotiations.  If the deal was a "no go," the Parties would discuss possible Plan B alternatives, which included the following options that Mr. Megibow identified in his March 3 email and that Mr. Golden agreed were "workable":



77.    Mr. Megibow noted in his March 3 email that the Parties

███████████████████████████████.  Thus, there was no guarantee that the Parties would continue to work together, as contemplated by the second and third Plan B options.

78.    If the Parties did not reach agreement on the second or third Plan B option, the only other option contemplated by the March 2020 modification was that they would go their separate ways, resuming sale of pre-MSA products, with no further collaboration on combined products. That option did not require the Parties to negotiate any further agreement.  Thus, I consider that option to be the "default" that applies if it became clear that the Proposed Transaction would not proceed, and the Parties did not reach agreement on a different option.

79.    In view of the March 2020 modification, Purple's August 10 Notice that it had decided not to proceed was consistent with the Parties' agreement to reach a "go/no go" decision by the summer of 2020.  Consistent with the March 2020 modification, Purple's August 10 Notice gave ReST and PatienTech the option to treat the MSA as terminated and to discuss Plan B options. ReST and PatienTech exercised that option by providing their August 11 Notice of Termination and seeking to negotiate a supply agreement for Purple Grids, consistent with the second Plan B option.  No agreement was reached on a supply agreement, so that left the default option of both sides resuming their pre-MSA business, with no further work on combined products.

80.    As noted above, the Parties have not disputed my view that the MSA was modified in March 2020 to reach a go/no go decision by the summer of 2020.  Indeed, Purple stated during closing argument that the Parties' "go/no go" agreement ████████████████████████ ████████  (Day 10 Transcript at 17:7-10.)  Similarly, Respondents stated in their post-hearing brief that ███████████████████████████████████████████████████ █████████████████  (Respondents' October 12, 2023, Respondents' Opposition to Post-Hearing Brief.)

81.    Despite agreeing that the MSA was modified, Purple argues that it was terminated due to breaches by ReST and PatienTech.  I address that argument in the next section below.

## IV.    ANALYSIS OF PURPLE'S CLAIMS

### A.    Purple's Claim for Wrongful Termination and Return of its $4 Million Payment

82.    Purple seeks a refund of █████████████, minus the reasonable value of goods and services received, asserting that the MSA was terminated due to multiple breaches by ReST. █████████████████████████████████████████████████████ ██████████████████████).  (Purple's Confirmation of Claims at 11-12.)

83.    Purple relies on Section 10.2.4 of the MSA, which states:



84.    Purple contends that the MSA was terminated due to the following breaches by ReST:



85.    ReST and PatienTech assert that no refund is due because the termination of the MSA was the fault of Purple, and not of ReST and PatienTech.  They assert that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (MSA, § 10.2.2.)

86.    ReST and PatienTech assert that (a) they did not breach the MSA; (b) Purple did not provide notice of material breach and an opportunity to cure; and (c) Purple never provided any type of termination notice.  They also assert that their August 11 Notice of Termination was proper, and that it was Purple who breached the MSA by refusing to continue negotiations about the Proposed Transaction.

---

[3]  Section 10.2.1, 10.2.3, and 10.2.4 provide other grounds for termination, but Purple does not assert that these other clauses apply.

87.     I find that Purple has not shown that the MSA was terminated due to any of these alleged breaches, for the reasons set forth below.

### 1.   ReST's August 11 Notice of Termination

88.     As discussed above, ReST and PatienTech notified Purple on August 11, 2023, that they were terminating the MSA immediately, because Purple had breached the MSA by refusing to continue to discussions regarding the Proposed Transaction, which was an incurable breach.

89.     Purple argues that ReST and PatienTech had no basis to terminate the MSA, and that their August 11 Notice of Termination was a repudiation of the MSA that gave Purple the right to terminate the MSA.  Purple asserts that Utah law is clear that an improper notice of termination is a "total breach," citing *Mrs. Fields Franchising, LLC v. MFGPC, Inc.*, 2018 WL 3972924, at *12 (D. Utah Aug. 20, 2018), and other cases.

90.     I agree with Purple that it did not breach the MSA by ending negotiations about the Proposed Transaction in August 2020.  As discussed above, the two CEOs agreed in March 2020, that they would try to reach a "go/no go" decision by the summer of 2020.  That agreement modified and superseded any obligation to continue negotiations until January 2021.[4]

91.     In view of the March 2020 Modification, ReST and PatienTech did not have the right to terminate the MSA on the ground that Purple's refusal to continue negotiations was a breach of the MSA.  I find, however, that they did have the right to terminate on the ground that the March 2020 modification gave either side the option to terminate the MSA if it became clear by the summer of 2020 that the Proposed Transaction would not proceed.  Purple gave clear notice on August 10 that its Board had decided not to pursue the Proposed Transaction.  Therefore, ReST and PatienTech had the option to terminate the MSA and to pursue one of the Plan B alternatives.

92.     ReST's August 11 Notice of Termination made clear that Respondents considered the MSA to have been terminated.  While ReST and PatienTech did not have a right to terminate the MSA due to a breach by Purple, they did have that right to pursuant to the March 2020 Modification and Purple's notice that it would not proceed with the Proposed Transaction.  Thus, I find that the MSA was terminated by the combination of Purple's August 10 notice that it would not pursue the Proposed Transaction, and ReST's August 11 Notice of Termination.  That

---

[4]  Purple argues that any obligation to continue negotiations until January 2021 was illusory because an "agreement to agree" is not enforceable under Utah law.  I need not address that argument because I find that the Parties shortened the negotiation period to the summer of 2020.

termination was by mutual agreement, pursuant to the March 2020 Modification, and was not due to a breach by either side.

93.    Purple relies on *Mrs. Fields Franchising, LLC v. MFGPC, Inc.*, 2018 WL 3972924, *10-*11 (D. Utah Aug. 20, 2018), for the principle that an improper notice of termination is a breach of contract, even if it was based on a good faith belief that the termination was proper.  That principle does not apply because the March 2022 modification provided ReST and PatienTech with the option to terminate the MSA after Purple notified them that it had decided not to pursue the Proposed Transaction.  Thus, the August 11 Notice of Termination was not improper.

### 2.    Termination Due to Late Revenue Share Payments

94.    Purple contends that ReST and PatienTech breached their obligation to make "Revenue Share" payments under the MSA.  Purple relies on MSA Section 11.8, ████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████

95.    ReST and PatienTech do not dispute that they failed to make the Revenue Share payments required by the MSA.  Instead, they argue that Purple had no right to terminate the MSA on this ground because (a) Purple had agreed to extend the payment deadline; (b) the delay in payment was a curable defect; and (c) Purple did not provide formal notice of breach and an opportunity to cure, as required by the MSA.  I agree with all three points.

96.    The evidence shows that Purple requested ReST and PatienTech to make the Revenue Share payments, but did not press this point aggressively until after Purple's August 10 Notice that it would not pursue the Proposed Transaction.  Indeed, the evidence shows that Purple decided not to press this issue before the launch of the Purple-Enhanced ReST Bed, because it did not want to delay that launch.  On June 29, 2023, Bret Mitchell of Purple stated in an email to Craig Phillips, Joe Megibow and others: ████████████████████████████████
██████████████████████████████████████████ (Ex. 2291.002.)  Mr. Megibow replied on the same date: ████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████ (Ex. 2291.002.)

97.    Consistent with Mr. Megibow's comment, Mr. Phillips waited until July 7 to raise the Revenue Share issue.  Even then, he took a soft approach, proposing that ReST pay the Revenue Share balances ████████████████████████████████████████████████



. (Ex. 75.005.)  Mr. Golden replied the same day that ████████ (Ex. 75.002.)  He further stated:

(Ex. 75.002-.003.)

98.    Also on July 7, Mr. Golden sent Mr. Megibow an email that ended with the following sentence: ████████ (Ex. 75.001.)

99.    Thus, the evidence shows that as of August 10, 2022, the Parties were discussing a payment plan for the overdue Revenue Share payments, and Mr. Megibow had assured Mr. Golden that they were ████████

100.    Section 10.2.2 of the MSA ████████ (MSA, § 10.2.2.)

101.    Purple does not contend that the late Revenue Share payments constituted an "incurable" breach.  Purple has cited no evidence that before August 11, 2020, Purple provided written notice that it considered the late Revenue Share payments to be a "material breach" and would terminate the contract if it was not remedied.  Purple provided such notice on August 24, 2020 (Exhibit C-016), but that was two weeks after the MSA had already been terminated as a result of Purple's August 10 Notice and ReST's August 11 Notice of Termination.

102.    Purple contends that a contractual duty to provide notice and an opportunity to cure is excused when there is "an anticipatory breach by repudiation" or this would be "futile." (Purple's September 22, 2022, Post-Hearing Additional Authorities and Materials ("**Purple's Opening Post-Hearing Brief**") at 2.)  Purple, however, has not shown that Respondents

28

"repudiated" the MSA before August 10.  Nor have they shown that that it would have been "futile" to provide notice and an opportunity to cure.

103.  Respondents' August 11 Notice of Termination would arguably constitute a "repudiation" if, as Purple contends, there was no basis for that notice.  As discussed above, however, I find that Purple's notice that it would not pursue the Proposed Transaction provided Respondents with an option to terminate the MSA.

104.  In sum, I find that the delay in Revenue Share payments did not entitle Purple to terminate the MSA for material breach because Purple did ███████████████████████████ ███████████████████████████

### 3.   Termination Based on Breach of Due Diligence Obligations

105.  Before the hearing, Purple asserted that ReST and PatienTech had breached the MSA by failing to provide the due diligence information that Purple needed.  (*See*, *e.g.*, Purple Confirmation of Claims, at 6.)  Purple relied on Section 11.7 of the MSA, which states: ███ ██████████████████████████████████████████ ██████████████████████████████████████████ ███████████████████████████

106.  I expressed the preliminary view at the hearing that (a) Purple had not demonstrated that ReST and PatienTech had breached their due diligence obligations; and (b) Purple did not give notice of material breach due to failure to cooperate with due diligence or an opportunity to cure.

> … I haven't seen persuasive evidence of other grounds to terminate, specifically as to due diligence.  I didn't see per[su]asive evidence that there was failure to cooperate as to due diligence.
>
> It seems that for the most part ReST was responding to due diligence requests.  There was an issue as to trade secrets and source code algorithms, but I think there was an email where Purple said, okay, we understand your position we'll come look at the source code in your room.
>
> And I certainly didn't see a notice saying, You've now -- we are giving notice of termination because you failed to cooperate with due diligence.  That's certainly [a] curable kind of a defect.  And under the contract, you know, to terminate, you have to give notice of breach and opportunity to cure.

(Day 9 Hearing Transcript, 150:13 to 151:4.)

107.   Purple has not persuaded me to change my preliminary view.   Respondents submitted extensive evidence that they replied to Purple's due diligence requests.   They also cited evidence that Purple was generally satisfied ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████   (Ex. 2349.001.)

108.   Purple, in contrast, did not cite any evidence in its closing arguments or post-hearing submissions that ReST and PatienTech breached their due diligence obligations.   Nor did it cite any evidence that Purple ████████████████████████████████████████████████████ as required by MSA Section 10.2.2.   Therefore, I find that Purple has not demonstrated that it was entitled to terminate the MSA due to a breach of due diligence obligations.

109.   In sum, Purple has not shown that the MSA was terminated ████████████████ ██████████████████████████████████████████████   In particular, Purple has not shown that the MSA was terminated due to a material breach by Respondents that was either incurable or that they failed to cure after Purple provided written notice and an opportunity to cure.   Therefore, I reject Purple's claim for a refund of its initial fee.

**B.   Purple's Claim for Revenue Share Payments**

110.   Purple claims that ReST and PatienTech breached their obligation to make the quarterly Revenue Share payments required by MSA Section 11.8.   Purple asserts that such payments were due for the full one-year term of the MSA, from January 13, 2020 to January 12, 2021.   Purple asserts that the total due for that one-year period is $1,925,871.   (Schedule 2 to Purple's Opening Post-Hearing Brief).)

111.   In the alternative, Purple asserts that if Revenue Share payments are limited to the period from January 13, 2020 to ReST's August 11 termination notice, the total due for that period is $1,256,598.   Purple also asserts that if Revenue Share payments are due on ReST's sales of Purple-Enhanced ReST Beds after August 11, 2020, the additional payment due would be $67,703.   (Schedules 2.1 and 2.7 to Purple's Opening Post-Hearing Brief).)

112.   ReST and PatienTech do not dispute that they failed to make the quarterly Revenue Share payments required by MSA Section 11.8 for the first and second quarters of 2020, or the portion of the third quarter of 2020 that preceded their August 11 Notice of Termination.   (Respondents' Post-Hearing Opposition at 20.)   They also do not dispute Purple's calculation of the Revenue Share due for that period.   Accordingly, I find that ReST and PatienTech are liable to Purple for Revenue Share payments of $1,256,598 for the period of January 13, 2020 to August

11, 2020.  That liability is joint and several because Section 11.8 requires ███████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ by the MSA.

113.   The only dispute concerns what Revenue Share payments, if any, should be made for ReST's sales after the August 11 Notice of Termination.  Purple contends that MSA Section 11.8 required ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████

114.   In contrast, ReST and PatienTech contend that their August 11, 2020 Notice of Termination ended any obligation to make Revenue Share payments.

115.   The MSA is unclear as to the impact of termination on Revenue Share payments. Section 11.8 states ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████   That clause is clear that this obligation ends if the Parties agree to an M&A deal that supersedes it.  It is not clear, however, what happens if the Parties do not agree to a deal.

116.   At the merits hearing, I expressed the following preliminary views:[5]

- There is an obvious gap in the contract, in that it does not address what happens with the Revenue Share obligation if there is no deal.  Continuing that obligation to the end of time would not be reasonable.

- The two CEOs agreed that the Revenue Share obligation stops on termination, which means at the end of the one-year term in January 2021 at the latest.  What was not agreed is what happens if the contract is terminated early.

- My preliminary inclination was that the August 11 termination of the MSA ended the Revenue Share obligation for the most part, because that termination was effectively due to a type of mutual agreement (including the March 2020 modification), rather than due to a breach by either side.

---

[5] Day 9 Transcript, 166:14 to 169:14.

- I noted, however, that it may make sense to continue the Revenue Share obligation after the MSA was terminated as to the Purple-Enhanced ReST Bed, since those were basically sold pursuant to the MSA.

- I asked the Parties to confer on the Revenue Share that would be due for sales of the Purple-Enhanced ReST Bed after August 11, 2022, in case I decided that the Revenue Share should apply to such sales.

117.    During closing arguments, Purple asserted that Revenue Share was due until the end of 2020 because ReST's August 11 Notice of Termination was improper. [6] Purple did not discuss whether Revenue Share was due after August 11 if I adopted my preliminary view that the MSA was terminated on that date.  Purple also did not address that issue in its post-hearing brief; instead, it asserted that Revenue Share was due until the MSA term ended on January 12, 2021, "[f]or reasons expressed before and during the hearing."  (Purple Opening Post-Hearing Brief at 15.)

118.    Pursuant to my request, Purple provided an alternative calculation of the post-August 11 Revenue Share if it were limited to sales of the Purple-Enhanced ReST Bed.  Purple calculated that amount as $67,703, based on ReST's sale of 58 Purple-Enhanced ReST Beds from August 11 to September 30, 2020.  (Schedule 2.7 to Opening Purple Post-Hearing Brief.)

119.    During closing arguments, ReST and PatienTech argued that Purple's August 24, 2020 letter "actually recognizes that termination of the agreement cuts off the revenue-share obligation."  (Day 10 Hearing Transcript at 53:3-21.)  Respondents cited Purple's statement that "[i]nasmuch the Agreement is not terminated, we also expect prompt payment of the amounts that will be owed from the Revenue Share calculations for 3Q and 4Q of 2020 and through the scheduled termination date in January 2021."  (Ex. 16 at 2.)

120.    In its Post-Hearing Brief, ReST and PatienTech further argued that the Revenue Share obligation was part of the MSA, so they should not be required to pay Revenue Share after the MSA was terminated on August 11, 2020.  (Respondents' October 12, 2023, Response to Purple's Post-Hearing Brief, at 7 ("**Respondent's Post-Hearing Opposition**").)  ReST and PatienTech asserted that revenue sharing "was part of the set of mutual promises the parties made to each other in the MSA," which include Purple's promise to "purchase and receive delivery of Products from Vendor," as well as Purple's agreement to negotiate about a possible M&A deal.  (*Id.* at 3-4.)  ReST and PatienTech asserted that Purple's August 10 "no go" decision notice that it

---

[6] Day 10 Transcript, 31:12-23.

would not pursue the Proposed Transaction meant that Purple "was going to buy no more kits, engage no more services, and negotiate no more," so "[a]ll benefits ReST was to receive under the MSA had been cut off." (*Id.* at 4.)

121.   Having considered the Parties' arguments, I confirm my preliminary view that the August 11 termination of the MSA ended the Revenue Share obligation for the most part, but that obligation continued as to sales of the Purple-Enhanced ReST Bed.  My reasons are as follows.

122.   First, as ReST and PatienTech note, revenue sharing was part of a mutual set of obligations imposed by the MSA.  Termination of the MSA would ordinarily end all obligations of both sides, except for obligations that expressly survive termination.

123.   Second, the MSA does not state that the Section 11.8 Revenue Share obligations survive termination.  On the contrary, MSA Section 10.4 states:



124.   Section 10.4 identifies ████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

125.   Revenue Share payments are not an ███████████████████████ as of the August 11 date of termination for products sold after that date.  Revenue Share also has nothing to do with indemnity, confidentiality, or Section 10.3.

126.   The fact that Section 10.4 does not refer to Revenue Share is especially significant because it does refer to Section 10.3, which potentially applies only if the MSA is terminated early. Thus, the Parties did consider the impact of early termination in the context of Section 10.3, but did not specify that the Section 11.8 Revenue Share obligation survives early termination.

127.   Section 10.3 includes a "catch-all" clause that indicates that other obligations that are not specifically identified may survive termination if they are ███████████████████████ ███████████████████████████████████████  Purple, however, has not presented any persuasive argument as to why the obligation to make Revenue Share payments on pre-existing ReST products that have no connection with Purple should survive termination.

128.   In contrast, I interpret the MSA as requiring post-termination Revenue Share payments as to ReST's sale of the Purple-Enhanced Bed because that is a joint product that results from the collaboration under the MSA.  If the MSA had not been signed, ReST would never have been able to sell the Purple-Enhanced Bed.

129.   As discussed below, I find that ReST had a limited right to continue to sell the Purple-Enhanced Bed using Purple Grids that ReST purchased before the MSA was terminated. In view of that limited right, I find that ReST and PatienTech had a corresponding obligation to make Revenue Share payments on post-termination sales of the same product.

130.   ReST and PatienTech state that they do not contest "Purple's claim for $67,703 in revenues share for the 2020 Beds sold after August 10."  (Respondents' Opposition to Post-Hearing Brief at 20.)  They also do not dispute Purple's right to Revenue Share for the period before August 10, 2020, or Purple's calculation of the principal amount as $1,256,598. ███████

131.   Accordingly, for the reasons set forth above, I find that ReST and PatienTech are jointly and severally liable to Purple for Revenue Share payments in the principal amount of $1,256,598 plus $67,703, or a total of $1,324,301.

**C.    Purple's Trademark Infringement Claim for the Pre-TRO Period**

132.   Purple asserts several claims arising from Respondents' alleged use of Purple's trademarks and trade dress, as well as their "overselling" (or "bait-and-switch") conduct.   I will refer to those claims collectively as Purple's "**IP Claims**."  Purple's IP claims concern two periods: (1) from the August 11, 2020 termination of the MSA until the Utah District Court issued a TRO and ReST stopped using Purple's trademarks on December 13, 2020 (the "**Pre-TRO period**");[7] and (2) from December 14, 2020 until August 2, 2021, which is the last date for which there is evidence that ReST was still using a purple grid image on its website (the "**Post-TRO period**").

---

[7] The record is not entirely clear as to the precise date that Respondents ceased use of Purple's trademarks, but the Parties have assumed that such use stopped on December 13, 2020.

133.   Purple relies primarily on trademark and trade dress infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a) and 15 U.S.C. § 1125(a).  Purple has also asserted claims for unfair competition and false advertising under the Lanham Act; trademark infringement and unfair competition under common law; and deceptive trade practices under Utah statutes.  I do not analyze those claims separately, as Purple states that the elements are the same or very similar to its federal trademark and trade dress infringement claims.  (Purple's Elements of Claims at 8-12.)

134.   I analyze the Pre-TRO period first because it raises different issues than the Post-TRO period.

### 1.     The Parties' Positions Regarding Purple's IP Claims

135.   As discussed above, I find that the MSA was terminated on August 11, 2020.  Purple contends that termination of the MSA required Respondents to cease all use of Purple IP.  Purple relies on Section 4.3 of the MSA, which states:



136.   Purple claims that Respondents infringed the Purple trademarks and trade dress by using them to market and sell the ReST + Purple bed on the ReST website until they ceased such use shortly after the Utah District Court issued a TRO on December 11, 2020.  Purple also claims that Respondents violated the Lanham Act and unfair competition laws by continuing to market the ReST + Purple bed, even though they did not have sufficient Purple Grids to meet demand for that product.  Purple refers to this conduct as "overselling" or "bait-and-switch," meaning that Respondents used customer interest in the ReST + Purple bed to sell the ReST + ReST GelGrid product, which contained a grid purchased from a different company.

137.   Purple seeks damages of $230,119 for the pre-TRO period from August 13 through December 13, 2020.  That amount is based on the calculations of Purple's damages expert, Richard Hoffman, of the gross profits that ReST received on infringing sales during that period.

138.   Purple also seeks an award of treble damages under the Lanham Act, as well as punitive damages.  In addition, Purple asserts that Robert Golden should be held personally liable.

139.   Respondents do not dispute that ReST continued to use the Purple trademarks on the ReST website to market the ReST + Purple bed until the TRO was issued.  They contend, however, that under the "first sale" doctrine, Purple's sale of Purple Grids to ReST entitled them to use the

Purple trademarks to advertise products that incorporated the Purple Grids, such as the ReST + Purple bed.  Respondents also contend that their promotion of the ReST + Purple bed was proper, given that they were actually selling that bed.

140.   Respondents assert that if liability is found, it should be limited to ReST, which was the party that marketed and sold the ReST + Purple bed.  Respondents assert that there is no evidence that PatienTech infringed Purple's IP rights.  Respondents also assert that Mr. Golden should not be held personally liable for any infringement, and that it would not be appropriate to award enhanced or punitive damages.

141.   Having considered the Parties' arguments and submissions, I rule as set forth below.

### 2.    Purple's IP Claims against PatienTech

142.   I agree with Respondents that Purple has presented no evidence that PatienTech infringed Purple's trademarks or trade dress or engaged in improper overselling conduct.  The evidence presented by Purple concerns marketing and sales by ReST, and not by PatienTech.  PatienTech is ReST's corporate parent, but Purple has identified no basis to hold PatienTech liable for infringing conduct by its subsidiary.  Thus, I reject Purple's IP claims to the extent that they are directed against PatienTech, for both the Pre and Post-TRO Periods.

143.   Because I find no basis for liability by PatienTech, the following discussion refers to "ReST" rather than to Respondents.  Purple's claim that Respondent Golden should be held liable is discussed in Sections IV.C.6 and IV.D.3 below.

### 3.    ReST's Infringement of Purple Trademarks During the Pre-TRO Period

144.   Purple asserts that ReST infringed both its trademarks and trade dress and also engaged in unlawful "bait-and-switch" during the pre-TRO period of August 11 to December 13, 2020.  Purple, however, cannot obtain double or triple recovery of the same damages based on alternative theories.  Accordingly, I will focus on Purple's claim for trademark infringement, with reference to bait-and-switch in the context of damages.  There is no need for me to address trade dress for the Pre-TRO period, given that the alleged damages are the same.

145.  Purple relies on the Lanham Act, 15 U.S.C. § 1114(1)(a), which prohibits the unauthorized use in commerce of:

> any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

advertising of any goods or services on or in connection with which
such use is likely to cause confusion, or to cause mistake, or to deceive; or

146.   I find that ReST had an implied license to use Purple's trademarks and trade dress to market and sell the ReST + Purple bed.  Pursuant to the MSA, Purple and ReST agreed that ReST would develop, market and sell the ReST + Purple beds using Purple Grids.  Purple's supply of  grids for the purpose of implementing that agreement implies a license to use ReST's trademarks and trade dress as needed to fulfill that purpose.  A similar result follows from the first sale doctrine: Purple's sale of Purple Grids to ReST gave ReST the right to sell products that incorporated those grids. [8]

147.   Purple's damages expert, Richard Hoffman, treated ReST's sale of beds that included Purple Grids as "not infringing" because he "understand[s] that ReST acquired 202 Purple Grids from Purple, and that beds sold with those units had an implied license." [9]  Thus, Purple and its damage expert agree that ReST had an implied license.

148.   I find, however, that ReST's right to use Purple's trademarks and trade dress was limited to ReST + Purple beds that incorporated the Purple Grids supplied by Purple.  ReST did not have the right to use Purple's trademarks and trade dress to promote sales of other products that do not use Purple Grids, such as the ReST Bed with ReST GelGrid.  Sales of such other products were outside the scope of the implied license.  They are also not protected by the first sale doctrine, which is limited to products that incorporate components from the trademark owner.

149.   Respondents' interrogatory responses indicate that ReST sold 164 ReST + Purple beds in July, August, and September 2020, and then sold 134 ReST Beds with ReST GelGrid  in October, November, and December 2020, as set forth below:

---

[8] As discussed above, I find that Purple is entitled to receive Revenue Share payments of about $67,000 for the ReST + Purple beds that ReST sold after the MSA was terminated.  Thus, Purple is effectively receiving some compensation for ReST's post-termination use of its trademarks and trade dress to promote the ReST + Purple Bed.

[9] Hoffman Expert Report at 24 (footnote omitted); *see* Purple's Post-Hearing Brief at 17-18 (noting that Purple's damage calculations exclude 202 units, which is the number of Purple grids that Purple supplied to ReST).



150.    Because ReST was selling ReST + Purple beds until September 2020, I find that its use of Purple's trademarks and trade dress to promote sales of that product until September 2020 was covered by the implied license and did not infringe Purple's trademark rights.

151.    ReST, however, ceased sale of the ReST + Purple Bed in September 2020.  From October 2020, the only bed with a grid that ReST sold was the ReST Bed with ReST GelGrid. ReST nevertheless continued to use Purple's trademarks on its website to promote the ReST + Purple Bed from October until December 13, 2020.[10]   ReST also continued to use Purple's trademarks to promote the ReST + Purple bed in other marketing materials, such as a "Black

---

[10]  *See*, *e.g.*, C-017 (October 19, 2020 screen shot of ReST web page with the heading, "What's in the ReST Bed™ with the Purple Grid™?" and a graphic showing a layer-by-layer view of mattress with a purple-colored grid); C-022 (November 18, 2020 screen shot of ReST web page that shows three ReST Smart Beds, including "ReST Original Smart Bed w/ purple, " with a graphic showing a layer-by-layer view of a mattress with a purple-colored grid); Hoffman Expert Report at 23 & n.80 (December 9, 2020, ReST web page promoting the "purple Grid").

Friday" email blast that was sent on November 17, 2020, which stated: "*Save $1000* on ReST Original and ReST Original with Purple Smart Beds." (Ex. 21.)

152.    Given that ReST stopped sale of the ReST + Purple Bed in September 2020, I find that ReST infringed Purple's trademarks by continuing to use them from October 1 to December 13, 2020 to market a product that it was no longer selling.

### 4.    Damages for ReST's Trademark Infringement for the Pre-TRO Period

153.    Purple claims damages of $230,119 for ReST's infringement of its trademarks during the Pre-TRO period. Those damages reflect Mr. Hoffman's calculation of ReST's gross profits from sale of infringing products from August 12, 2020 through December 13, 2020, after excluding sales of ReST + Purple beds covered by the implied license. [11]

154.    Purple asserts that the Lanham Act authorizes it to recover ReST's gross profits from infringing sales. Purple relies on 15 U.S.C. § 1117(a), which states, in relevant part, that when a violation of a trademark is established:

> [T]he plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action….In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party

155.    Respondents' counsel stated during closing arguments that if infringement is found for the Pre-TRO Period, Respondents would accept Mr. Hoffman's calculation of $230,000 in damages. (Day 10 Tr. at 140:14 to 141:3.) After the hearing, however, Respondents opposed an award of ReST's gross profits. I reject Respondents' arguments for the reasons set forth below.

---

[11] Purple Opening Pre-Hearing Brief at 17; Hoffman Expert Report at 21-25 and Schedules 3, 3.1, 3.2.

### a. Bait-and-switch applies from the period from October 1 to December 13, 2020

156.   Respondents assert that the "bait-and-switch" and "initial interest confusion" cases cited by Purple are inapposite because ReST had Purple Grids in inventory and did not attempt to "pass its goods off" as Purple's.  (Respondents' Post-Hearing Opposition at 9.)

157.   I agree that the cases cited by Purple are not directly on point, but find that they are close enough to support an award of ReST's profits on sales of ReST beds with ReST GelGrid. The rationale of those cases is that use of a trademark to promote sale of products that are not those of the trademark owner may establish "a likelihood of confusion" for the purpose of trademark infringement, even if such confusion is dispelled by the time of the sale.  As one court explained:

> The initial interest confusion doctrine applies when "the Lanham Act forbids a competitor from luring potential customers away from a producer by initially passing off its goods as those of the producer's, even if confusion as to the source of the goods is dispelled by the time any sales are consummated." … This "bait and switch" technique allows competitors to get a foot in the door and engage the customer by using the goodwill established by the senior user to break the ice….

*ADT, LLC v. Cap. Connect, Inc.*, 145 F. Supp. 3d 671, 690 (N.D. Tex. 2015) (citations omitted); *accord Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 883 (E.D. Wis. 2009) ("Initial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated.  It is a "bait and switch" tactic that permits a competitor to lure consumers away from a service provider by passing off services as those of the provider, notwithstanding that the confusion is dispelled by the time of sale") (citations omitted), *aff'd*, 623 F.3d 436 (7th Cir. 2010).

158.   As discussed above, ReST continued to use Purple's trademarks to promote the ReST + Purple bed in October, November, and December 2020, even though it stopped sales of that product in September 2020.  Given that ReST did not begin advertising its ReST Bed with ReST GelGrid on its website until mid-December 2020, it is reasonable to infer that all sales before that date resulted from customer orders for the ReST + Purple Bed that were switched to orders for the ReST Bed with ReST GelGrid.   ReST has not disputed that this is the only logical explanation of how it could sell products that it was not even advertising.

159.   This specific fact pattern differs from the cases cited by Purple, but falls within the concepts of "initial interest confusion" and "bait-and-switch."  Customers who were initially attracted by the ReST + Purple bed were switched to the ReST Bed with ReST GelGrid.

160.   Respondents contend that any award of infringer's profits must be limited to the period of the alleged overselling.  (Respondent's Post-Hearing Opposition at 11-13.)  I agree with that point, but awarding damages based on ReST's sales from October to December 2020 is consistent with the period of overselling, given that ReST stopped sales of the ReST + Purple bed in September 2020, and switched to the ReST Bed with ReST GelGrid from October 2020.

### b.   The equities support an award of ReST's profits from sales of ReST Beds with ReST GelGrid

161.   Respondents assert that an award of infringer's profits under the Lanham Act is not automatic; rather, it depends on the equities, which do not favor such an award in this case.  Respondents are correct that an award of infringer's profits is "subject to the principles of equity." 15 U.S.C. § 1117(a).  I find, however, that the equities support such an award here.

162.   As discussed above, ReST had an implied license to use the Purple trademarks to market the ReST + Purple bed while it was still selling that product.  ReST, however, stopped selling that product in September 2020 and switched to the ReST Bed with ReST GelGrid.  ReST knew in October 2020 that it had made this switch.  ReST had no reasonable basis to believe that it had a license to use the Purple trademarks to promote a product that it was no longer selling.

163.   ReST also knew in October 2020 that negotiations for Purple to supply additional Purple Grids had broken down and that there was no realistic chance that it would receive additional grids.  Indeed, ReST decided to buy grids from a different company and to start selling the ReST Bed with ReST GelGrid.

164.   Further, Purple filed a lawsuit against ReST and PatienTech on October 13, 2020, which claimed that Respondents were infringing Purple's trademarks and sought both monetary and injunctive relief.  (Ex. 19.)  One week later, ReST filed its own lawsuit against Purple and its directors.  (Ex. 20).  ReST alleged that Purple's refusal to supply additional Purple Grids "has created a significant backlog of unfulfilled orders."  (Ex. 20, ¶ 55.)

165.   Despite alleging that it did not have enough Purple Grids to meet demand for the ReST + Purple bed, ReST continued to market that product.  ReST sent a "Black Friday" email blast on November 17, 2020 that advertised a $1000 discount on "REST Original with Purple

Smart Beds." (Ex. 21 at 2.) It also continued to market the "ReST Original Smart Bed w/ purple" on its website. (Ex. 22.)

166. ReST's marketing director, Kyle Taylor, testified that when the Black Friday email blast was sent in November 2020, he did not know if ReST had enough Purple Grids to fulfill demand. He then added that "this is the biggest sales day of the year, so I'm not going to not market a product." (Day 6 Hearing Tr. at 253:7 to 254:10.)

167. Given that ReST continued to use Purple's trademarks to market the ReST + Purple bed for several months after it stopped sales of that product, I find that the equities favor an award to Purple of ReST's profits on the ReST Beds with ReST GelGrid that was apparently sold to customers who had ordered the ReST + Purple bed.

168. Respondents contend that Purple has "unclean hands," in that it induced ReST to launch the ReST + Purple bed based on "the false promise that the acquisition was a near certainty," and then refused to supply additional Purple Grids unless ReST paid higher prices. (Respondent's Post-Hearing Opposition at 10.) I reject that argument because Respondents' "false promise" theory fails for the reasons in Section V.A.3 below. Further, while Purple took an aggressive position on grid prices after the MSA was terminated, ReST should have insisted that Purple sign a supply agreement before ReST launched the ReST + Purple bed.

169. Finally, ReST is in no position to complain about "unclean hands." ReST CEO Robert Golden took the truly egregious step of relying on forged evidence in an attempt to establish that Purple had entered into a supply agreement before the MSA was terminated.

### c. Respondents have not provided a persuasive reason to disregard their acceptance of Mr. Hoffman's calculation of ReST's profits

170. As noted above, Respondents' counsel stated during closing arguments that if liability is found for pre-TRO infringement, Respondents would accept Mr. Hoffman's calculation of $230,000 in damages. After referring to the "$230,000 that Mr. Hoffman calculated for the trademark damages" for the Pre-TRO Period, Respondents' counsel stated that "if we are liable for damages for that time period, we'll accept Hoffman's calculation." He add that Respondents' calculation is "roughly the same," and that "We'll just take Hoffman's calculation if it comes to that." (Day 10 Tr. at 140:20 to 141:3.)

171. Despite accepting Mr. Hoffman's calculation during closing arguments, Respondents challenge that calculation in their post-hearing brief. Respondents agree with "the

theory" of Mr. Hoffman's calculation, which is to calculate ReST's gross profits as 38% of its "infringing revenue," based on ReST's total revenues during the relevant period minus non-infringing revenues from ReST + Purple beds.  Respondents assert, however, that Mr. Hoffman incorrectly based ReST's total revenues on ReST's response to Interrogatory No. 12, which stated that Respondents received ███████ in revenues from all sales of ReST + Purple beds. (Respondents' Post-Hearing Opposition at 12-13.)

172.    I agree that ReST's response to Interrogatory No. 12 does not identify ReST's total revenues during the Pre-TRO Period.  It is overinclusive in that it includes sale of ReST + Purple beds before the MSA was terminated on August 11, 2020.  It is underinclusive in that it is limited to the ReST + Purple bed and does not include revenues from the ReST Bed with ReST GelGrid.

173.    I will nevertheless use Mr. Hoffman's calculation of $230,119 as a reasonable estimate of ReST's gross profits from sales of ReST Beds with ReST GelGrid during the Pre-TRO Period for the following reasons.  First, Mr. Hoffman included his calculation of $230,119 in gross profits in his Expert Report submitted on May 12, 2023.  Respondents did not challenge that calculation before or during the merits hearing.  Respondents submitted no rebuttal expert report. Respondents' counsel asked Mr. Hoffman to clarify his calculation of $230,000 during cross-examination, but did not assert that the underlying data was wrong.  (Day 4 Transcript at 230:3 to 237:16.)  Instead, they waited until October 12, 2023 — two months after the merits hearing —to challenge Mr. Hoffman's calculation in its Opposition Post-Hearing Brief.  Respondents' belated challenge was untimely and also prejudicial, in that Mr. Hoffman had no opportunity to address it. I find that Mr. Hoffman was a careful expert who likely would have explained or corrected his calculation if Respondents had raised this issue in a timely manner.

174.    Second, Respondents' counsel stated during closing argument that Respondents would accept Mr. Hoffman's calculation because it was similar to their own calculation of gross profits on sales of the ReST Bed with ReST GelGrid.  (Day 10 Tr. at 140:20 to 141:3.)

175.    Third, the evidence confirms that $230,119 is a reasonable estimate of ReST's gross profits from sale of the ReST Bed with ReST GelGrid during the Pre-TRO Period.  ReST sold a total of 134 ReST Beds with ReST GelGrid in October, November, and December 2020.  (Ex. 156.004, Respondents' Interrogatory Response No. 11, January 19, 2023.)  Kyle Taylor, ReST's Marketing Director, testified that the price of the queen-sized ReST + Purple Bed was about $5,000.  (Day 6 Hearing Tr. at 258:1-11.)  He also testified that the ReST Bed with ReST GelGrid had a similar price.  (*Id.* at 192:5-10.)  Thus, sale of 134 queen-sized ReST Beds with ReST

GelGrid should generate about ███████████████████████████████████ ████████████ which is close to Mr. Hoffman's amount.[12]

176.    In sum, I accept Mr. Hoffman's opinion that ReST received $230,119 in gross profits from infringing sales during the Pre-TRO Period because (1) Respondents did not challenge that amount during the merits hearing and affirmatively accepted it; (2) Respondents' post-hearing challenge was untimely and prejudicial; and (3) it appears to be a reasonable estimate of ReST's gross profits in any event.

### 5.    Enhanced Damages and Punitive Damages

177.    Purple seeks enhanced damages under 15 U.S.C. § 1117(a), which states that when trademark infringement is found, "the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount…."   Purple also asserts that Utah law authorizes punitive damages on its common law claims 5-10, citing Utah Code Section 788-8-201 for the principle that "where "compensatory or general damages are awarded and it is established by clear and convincing evidence that the acts or omissions of the tortfeasor are the result of willful and malicious or intentionally fraudulent conduct, or conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others."  (Purple's Confirmation of Claims at 10-11.)

178.    Respondents oppose an award of enhanced damages, emphasizing that the Lanham Act specifies that any award "shall constitute compensation and not a penalty."  (Respondents' Post-Hearing Opposition at 17, citing 15 U.S.C. § 1117(a).)  They also oppose an award of punitive damages, arguing that Purple has not proven any compensatory or general damages, and that ReST's conduct did not rise to the level that would justify punitive damages.

179.    I decline to award enhanced or punitive damages.  Although I find that ReST infringed Purple's trademarks from October 1 to December 13, 2020, I also find that ReST had an implied license from August 11 to September 30, 2020 to use those trademarks to promote its ReST + Purple bed.  Further, ReST had at least some argument that Purple's refusal to continue

---

[12] The 134 beds include 31 beds sold in December, some of which were presumably sold after ReST stopped use of Purple trademarks on December 13.  Some of those sales, however, may have been from customers who saw "ReST + Purple" ads before that date.  Further, excluding post-December 13 sales results in damages similar to $230,000.  If 13 of the 31 sales in December were before December 14, ReST sold ████████ from October 1 to December 13.  Multiplying ███████████████████████████████████████

negotiations about the Proposed Acquisition and refusal to supply Purple Grids at the prior prices was improper and gave ReST the right to take reasonable countermeasures, including the right to use Purple's trademarks.

180.   I have ruled that ReST did not have the right to use Purple's trademarks after it stopped sale of the ReST + Purple bed in September 2020.  I find, however, that ReST's conduct was not so egregious as to warrant the imposition of enhanced or punitive damages.  I also find that the award of ReST's gross profits from sale of the ReST Bed with ReST GelGrid is adequate to compensate Purple for any harm caused by ReST's infringement of Purple's trademarks.

### 6.   Personal Liability of Respondent Golden

181.   Purple contends that Respondent Golden should be personally liable for ReST's trademark infringement because he was the "moving force" behind that infringement and "actively and knowingly caused that infringement."   (Purple's Opening Post-Hearing Brief at 12-13; Purple's Elements of Claims at 8-9.)

182.   Respondents argue that Mr. Golden should not be held personally liable because Purple has not shown that Mr. Golden controlled the content of the ReST website.  Respondents assert that Kyle Taylor managed the ReST website, and that Lloyd Sommers controlled day-to-day activities.  (Respondents' Post-Hearing Opposition at 19.)

183.   The evidence is clear that Mr. Golden exercised ultimate control of all activities at ReST, which is a small company.   There is no direct evidence, however, that Mr. Golden specifically approved all content on the ReST website, or that he authorized the decision to continue to use the Purple trademarks even after ReST stopped selling the Purple + ReST bed in September 2020.

184.   It is reasonable to assume that Mr. Golden approved the decision continue to use the Purple trademarks to promote the Purple + ReST bed, given that this was an important decision and both sides filed lawsuits in October 2020,  I find, however, that Purple has not demonstrated that Mr. Golden "actively and knowingly caused" ReST to infringe Purple's trademarks.  ReST had at least some argument that it was Purple that breached the MSA by refusing to continue negotiations about the Proposed Acquisition and refusing to supply Purple Grids at the prior prices. Purple has not made a sufficient showing to warrant holding Mr. Golden personally liable.

### D. Purple's Claim for Trade Dress Infringement in the Post-TRO Period

185.   Purple does not dispute that ReST stopped use of Purple's trademarks (such as "Purple" and "Purple Grid") shortly after the TRO issued on December 11, 2020.  Purple contends, however, that ReST used an image of a purple-colored grid to promote its ReST Bed with GelGrid that is virtually identical to the image that ReST previously used to promote the ReST + Purple Bed.  This is illustrated by Figure 1 below, which compares screenshots of the ReST website on November 18 and December 15, 2020.

**Figure 1: ReST's Pre and Post-TRO Ads with Purple-Colored Grids**



| **ReST Original Smart Bed w/ Purple**<br>November 18, 2020 ReST Website (Ex. 28) | **ReST Original Smart Bed w/ GelGrid**<br>December 15, 2020 ReST Website (Ex. 27) |

\

186.   Purple contends that ReST infringed Purple's trade dress rights by using the above image of a mattress with a purple-colored grid to promote the ReST Bed with GelGrid from December 13, 2020 until August 2, 2021, which is the day before ReST changed the image to a blue-colored grid. [13]

---

[13] Purple's damages expert, Richard Hoffman, notes that archived images of ReST's website show that it was still using a purple-colored grid on August 2, 2021, and that the grid color was blue on September 22, 2021.  He could not find an archived image between those dates, so he assumed that the color was changed on August 3.  (Hoffman Report at 25-26.)

187.   The Tenth Circuit has held that liability for trade dress infringement involves the following elements:

> Pursuant to the Lanham Act, a person may bring a federal cause of action for trade dress infringement.   15 U.S.C. § 1125(a); *Hartford House,* 846 F.2d at 1271.   A product's trade dress "is its overall image and appearance, and may include features such as size, shape, color or color combinations, texture, graphics, and even particular sales techniques." *Sally Beauty Co., Inc. v. Beautyco, Inc.,* 304 F.3d 964, 977 (10th Cir.2002) (*citing Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 764 n. 1, 112 S. Ct. 2753, 120 L.Ed.2d 615 (1992)). To establish a claim of trade dress infringement, a plaintiff must show: (1) The trade dress is inherently distinctive or has become distinctive through secondary meaning; (2) There is a likelihood of confusion among consumers as to the source of the competing products; and (3) The trade dress is nonfunctional. *Id*.; 15 U.S.C. § 1125(a)(3).

*General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226-27 (10th Cir. 2007).

188.   In view of this test, I first consider whether Purple has established trade dress rights in a purple-colored grid as part of a mattress, which is distinctive and non-functional.   I then consider whether Purple has shown that ReST infringed its trade dress because its use of a purple-colored grid to market its ReST Bed with ReST GelGrid created a "likelihood of confusion." Finally, I consider what damages are appropriate for any infringement

### 1.   Does Purple have trade dress rights in a purple-colored grid?

189.   Purple asserts that it has protectable trade dress rights in using the color purple in connection with mattresses in general, and in connection with a purple-colored grid in particular. I agree with Purple for the following reasons.

190.   First, it is undisputed that Purple's use of the color purple is "non-functional."   The specific color of a gel grid is arbitrary and does not have any practical advantages.

191.   Second, it is also undisputed that the use of a specific color can constitute trade dress, as stated in the cases that Purple has cited.   Purple's Opening Post-Hearing Brief at 11; Purple's Post-Hearing Legal Authorities, Ex. 1130.008 to 1130.010.)   ReST replied to Purple's cases by stating that it does not dispute that "a color may constitute trade dress." (Respondents' Summary of Purple's Trademark Authorities, Ex. 2476.001 (emphasis in original).)

192.   Third, I reject ReST's argument that Purple has no trade dress rights because the Purple Grid is a "non-visible internal component," rather than part of the "product design or packaging." (*See* Respondents' Post-Hearing Opposition at 14-15.)  While the Purple Grid is internal, Purple prominently featured the Purple Grid in its advertising, with pictures of purple-colored grids, as illustrated by Figure 2 below.

**Figure 2: Purple Grids in Purple's Advertising for Purple Products**
(Exhibits 10, 11)



193.   Similarly, when ReST launched the ReST + Purple bed in July 2020, it emphasized the Purple Grid with images of a purple-colored grid, as shown in Figures 3 and 4 below.

**Figure 3: Purple Grids in ReST's Advertising for the ReST + Purple Bed**
(October 19, 2020; Ex. 17)



**Figure 4: ReST Website with Purple Grid** (Undated; Ex. 18)



194.   Given that Purple and ReST featured purple-colored grids in their advertising for Purple products and the ReST + Purple bed, I find that the internal nature of this component does not prevent it from being part of Purple's trade dress.

195.   Fourth, I find that Purple's use of the color purple in connection with a gel grid for a mattress is inherently distinctive, so there is no need to show that it has acquired secondary meaning.  As Purple notes:

> The Tenth Circuit has held "that the use of color in product packaging can be inherently distinctive (so that it is unnecessary to show secondary meaning) only if specific colors are used in combination with a well-defined shape, pattern, or other distinctive design."

*Kodiak Cakes LLC v. Continental Mills, Inc*., 358 F. Supp.3d 1219, 1228 (D. Utah 2019), quoting *Forney Indus., Inc. v. Daco of Mo., Inc*., 835 F.3d 1238, 1248 (10th Cir. 2016).

196.   Purple uses the color purple in connection with a "well-defined shape," namely, a gel grid with a distinctive shape.  ReST adopted the same trade dress to promote the ReST + Purple bed.  The use of the color purple is arbitrary and hence "inherently distinctive and entitled to trademark protection."  *Kodiak Cakes*, 358 F. Supp.3d at 1227.

197.   Fifth, even if it were assumed that a purple-colored grid is not inherently distinctive, Purple has shown that it has acquired secondary meaning as referring to Purple beds and the Purple Grid.  ReST's CEO, Robert Golden, testified that the Purple bed was "very hot," and that dealers wanted "a piece of the action" by having "the Purple-type product in their showrooms."  Dealers were "clamoring for a bed with the Purple-brand grid in them."  Thus, dealers were "thrilled" when told that they could obtain a ReST bed "with  a Purple Grid in it and the brand — that brand, more importantly."  (Day 3 Transcript at 130:8-22.)

198.   Similarly, Kyle Taylor, ReST's Marketing Director, testified that ReST's April 2020 marketing plan featured "a new Purple Grid layer" because the "image of the purple-colored grid was important branding for promoting the ReST 2020 bed."  (Ex. 2174.2; Day 6 Transcript at 233:5-18.)  Mr. Taylor knew that the Purple bed had a purple-colored grid and used similar images to promote the ReST + Purple bed because "[i]t was the only thing that differentiated it from the other product we were trying to sell."  (Day 6 Transcript at 234:7-9, 234:18-24.)

199.   Further, Lloyd Sommers, ReST's General Manager, admitted that he asked a company that sources components from China to identify the exact purple pantone that Purple used, so that ReST could obtain an alternative gel grid with the same purple pantone.  (Day 5 Transcript at 107:23 to 109:18.)

200.   As Purple notes, evidence that the accused infringer deliberately copied the color and shape of a medical pill (Persantine) supports a finding that such color and shape has acquired

secondary meaning, in that "only if the substitute has the same trade dress can the buyer be misled into thinking that the medicine comes from the accustomed source." Thus, "defendants' selection of a tablet with trade dress virtually indistinguishable from that of the plaintiffs' betrays their belief that the plaintiffs had established secondary meaning in the Persantine trade dress." *Boehringer Ingelheim G.m.b.H. v. Pharmadyne Laboratories,* 532 F. Supp. 1040, 1056-57 (D.N.J. 1980).

201.  Similarly, ReST's decision to use a purple-colored grid to advertise its ReST + Purple bed, and its attempt to obtain an alternative grid with the same purple color, show that Purple's purple-colored grid had acquired secondary meaning as referring to the Purple Grid.

### 2. Has Purple shown that ReST's use of a purple-colored grid creates likely confusion?

202.  The Lanham Act, 15 U.S.C. § 1125(a)(1)(A), imposes liability on a party that has engaged in conduct that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."

203.  "Likely confusion" may be shown by evidence that consumers have actually been confused, or by a properly conducted survey showing that consumers are likely to be confused as to the "origin, sponsorship, or approval" of the goods or affiliation between the goods and the trade dress owner. Courts have found likely confusion, however, even when there is no evidence of actual confusion and also no properly conducted survey.

204.  For example, in *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2017 WL 4010922 (N.D. Ill. Sept. 11, 2017), the court noted that "there was no evidence of actual confusion presented," but held that the plaintiffs "were not required to present evidence of actual confusion … or survey evidence…." *Id.* at *7 (citations omitted). The court then found that plaintiffs presented sufficient evidence to support the jury's finding of likely confusion, including:

- Side-by-side comparisons of Black & Decker's packaging of its DeWalt tools with defendants' similar packaging of Rockwell tools;

- Evidence that when defendants designed their packaging, they knew that plaintiffs "used a yellow and black color scheme" and "were trying to create the impression" that "Rockwell is somehow affiliated with Black and Decker and DeWalt."

*Id.*

205.   The court concluded that "[a] rational jury could find based on this evidence that Defendants' use of the yellow and black color scheme created a likelihood that consumers would mistakenly believe that Rockwell tools came from Plaintiffs."  *Id.*

206.   Similarly, in *Marker Int'l v. deBruler*, 635 F. Supp. 986, 1002 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988), the Utah District Court held that "surveys could be useful," but are not "vital" to determining likely confusion.  The court noted that other relevant factors include "the intent of the actor in adopting the designation," as well as "the degree of similarity between the designation and the trademark of trade name."  *Id.* at 997.  The court found that the plaintiff had established likely confusion for the purpose of an injunction against using plaintiff's sloping "M" mark for several reasons, including evidence that defendants had continued to use that mark even after its distributorship agreement with plaintiff had been terminated, in view of plaintiff's "fine reputation for quality," and the belief that customers might "associate that reputation" with defendants' products. *Id.* at 1000.

207.   I find that Purple's trademark and trade dress survey were not properly conducted for the reasons discussed at the hearing.  I also find, however, that Purple has presented sufficient other evidence of likely confusion.

208.   As shown by Figure 1 above, ReST's November 18, 2020 website displayed an image of the multiple layers of the "ReST Original Smart Bed w/ Purple" that features a purple-colored grid as the second layer.  ReST's December 15, 2020 website displayed a virtually identical image to promote the "ReST Original Smart Bed w/ GelGrid."  The only difference is that the December 15 image is brighter, as if a spotlight has been shone on the purple-colored grid.

209.   The evidence shows that ReST ended up using an alternative gel grid that was blue, not purple.  ReST nevertheless decided to continue to use the same image of a purple-colored grid it had created for the ReST + Purple bed to advertise its ReST Bed with ReST GelGrid

210.   Kyle Taylor, ReST's Marketing Director, admitted that the December 15 image of the "ReST Bed with ReST GelGrid" used "the same image that was used to promote the ReST Bed with Purple Grid," which included a purple-colored grid as the second layer.  (Day 6 Transcript at 267:18 to 268:16.)  When asked if ReST could have changed the purple-colored grid to a different color, such as blue, Mr. Taylor replied, "not easily."  (*Id.* at 268:21-24.)  Mr. Taylor admitted, however, that the color could have been changed to blue, and that creating the original graphic with a purple-colored grid cost "a few thousand bucks."  (*Id.* at 270:24 to 271:2.)

211. Mr. Taylor testified that he asked Lloyd Sommer "about changing the image of the purple-colored grid to a different color," but Mr. Sommers replied, "Leave it up." (*Id.* at 271:12-20.) Thus, ReST did consider changing the image of the purple-colored grid to a different color when it began marketing the ReST Bed with ReST GelGrid, but decided to use the same purple-colored grid it had created to promote the ReST + Purple bed.

212. There is no direct evidence as to why ReST decided to continue using a purple-colored grid to promote the ReST Bed with ReST GelGrid. As discussed above, however, ReST witnesses acknowledged that the Purple bed was a "very hot" product that dealers were "clamoring for" (Day 3 Transcript at 130:11-17); and that the "image of the purple-colored grid was important branding for promoting the ReST 2020 bed." (Day 6 Transcript at 233:5-18). In addition, ReST attempted to identify the exact purple pantone that Purple used, so that ReST could obtain an alternative gel grid with the same purple pantone. (Day 5 Transcript at 107:23 to 109:18; Ex. 85.)

213. Similar to *Black & Decker* and *Marker Int'l*, the evidence supports the inference that ReST decided to use the same purple-colored grid to promote the ReST Bed with ReST GelGrid because it knew that this image was associated with Purple and its Purple Grid, and may mislead customers into believing that the ReST Bed with ReST GelGrid was associated with Purple.

214. ReST argues that there is no possibility that customers would believe that the ReST Bed with ReST GelGrid was a Purple product, given that it appears on the website of ReST (not Purple), which repeatedly mentions the "ReST" brand name, and not that of Purple. I agree that customers would be unlikely to believe that the entire bed was made by Purple. However, ReST's use of a purple-colored grid misleadingly implied that the "ReST GelGrid" was in some way associated with or approved by Purple, even if the remainder of the bed was made by ReST. That implication was particularly strong, given that ReST had previously been selling a "ReST + Purple" bed that did include a component — the Purple Grid — that was made by Purple.

215. In view of the above evidence, I find that ReST created a "likelihood of confusion" by using the same graphic with a purple-colored grid that it created for the ReST + Purple bed to promote its ReST Bed with ReST GelGrid. Given that the ReST GelGrid was blue, there was no reason for ReST to use the same purple-colored grid other than to mislead customers into believing that the ReST product was affiliated with Purple in some way.

216. ReST argues that the *Boehringer* case cited by Purple involves secondary meaning only and does not support the conclusion that "intentional copying of trade dress established likelihood of confusion." (Respondents' Summary of Purple's Trademark Authorities, Ex.

2476.004.)  I agree that *Boehringer* concerns secondary meaning and did not address likely confusion.  However, as discussed above, the *Black & Decker* and *Marker Int'l* cases considered intentional copying of trade dress relevant to likely confusion.

217.   In sum, I find that ReST infringed Purple's trade dress because (a) use of a purple-colored grid is inherently distinctive and had acquired secondary meaning as referring to Purple and the Purple Grid; and (b) ReST created a likelihood of confusion by using the same graphic with a purple-colored grid that it had created to promote the ReST + Purple bed to advertise its ReST Bed with ReST GelGrid.

### 3.   Personal liability of Respondent Golden

218.   Purple presented no direct evidence that Mr. Golden made or approved the decision to continue to use an image of a purple-colored grid on ReST's website to advertise the ReST Bed with ReST GelGrid.

219.   Mr. Taylor testified that Mr. Sommers told him to "Leave it up," but did not know if Mr. Sommers talked to Mr. Golden about that decision.  (Day 6 Transcript at 271:12-25.)  When Mr. Taylor was asked if this was the kind of decision that Mr. Sommers would make, based on his time and experience at the company, Mr. Taylor replied, "Maybe."  Purple's counsel did not ask follow-up questions to Mr. Taylor, or question Mr. Sommers or Mr. Golden about this subject.

220.   Given the absence of direct evidence, I find that Purple has not demonstrated that Mr. Golden "actively and knowingly" caused ReST to infringe Purple's trade dress.  Accordingly, I decline to hold Mr. Golden personally liable for ReST's infringement of Purple's trade dress.

### 4.   What damages should be awarded for ReST's infringement of Purple's trade dress?

221.   Purple seeks an award of ReST's gross profits from sales of the ReST Bed with ReST GelGrid during the Post-TRO Period of December 14, 2020 to August 2, 2021.  Purple asserts that those profits are $434,363, citing the opinion of its damage expert, Mr. Hoffman. (Hoffman Expert Report at 26 and Schedule 3.)  Purple also seeks an award of enhanced damages under the Lanham Act, as well as punitive damages under Utah law.

222.   ReST does not dispute Mr. Hoffman's calculation of its gross profits during the Post-TRO Period.  ReST contends, however, that disgorgement of ReST's profits would not be proper for the same reasons it noted in regard to the Pre-TRO Period, namely, that this would not be equitable.  ReST also opposes an award of enhanced or punitive damages

223.   I find that the equities support an award of ReST's gross profits, but decline to award enhanced or punitive damages.

224.   On the one hand, ReST's infringement during the Post-TRO Period was not as blatant as during the Pre-TRO Period, in that ReST ceased using Purple's trademarks and displayed only a single image of a purple-colored grid.

225.   On the other hand, Purple continued to use the same image of a purple-colored grid that it had created to promote the ReST + Purple bed, even though the Utah District Court had ordered Purple to cease all use of Purple intellectual property.   Given that ReST's new gel grid was blue, ReST had no reason to continue to use the image of a purple-colored grid, other than to convey the false impression that the grid was somehow associated with Purple.

226.   I find that these differences with the Pre-TRO Period roughly offset each other. Disgorgement of profits is appropriate to compensate Purple for the harm caused by ReST's continued use of Purple's trade dress, but enhanced or punitive damages are not appropriate.

227.   ReST has not disputed Mr. Hoffman's calculation of ReST's gross profits during the Post-TRO Period.   Therefore, ReST is ordered to pay $434,363 to Purple for its infringement of Purple's trade dress during the Post-TRO Period.

### E.   The Parties' Claims and Counterclaims for Interest

228. In their pleadings, both sides sought an award of pre and post-award interest. (Purple's December 30, 2021, Statement of Claims at 59; Respondents' July 2, 2023, Second Amended Statement of Counterclaims at 12.)  However, neither side appears to have specified the interest rate or relevant period, or provided supporting calculations or legal authorities.

229.   Procedural Order No. 29 stated: "the Parties have requested a Partial Award that will cover all issues of liability, damages and interest, with a Final Award on allocation of fees and costs to follow, after submissions on fees and costs."   Procedural Order No. 29 also provided an opportunity for the Parties to submit post-hearing briefs.   Despite that opportunity, the Parties do not appear to have addressed interest in their post-hearing briefs.

230.   My preliminary inclination is to deny the Parties' claims for interest, in view of their failure to provide supporting calculations or legal authorities.   However, given that I am issuing an Interim Award that contemplates submissions on costs, I will provide the Parties an opportunity to explain why interest should be awarded in their cost submissions, despite their prior failure to

address this issue, if they wish to do so.  I note that I am more likely to consider post-award rather than pre-award interest, given that interest ordinarily accrues from the date an award is entered, and not including post-award interest would provide the other side with an incentive to delay payment.  I will make a decision on interest after reviewing the Parties' further submissions.

## V.  ANALYSIS OF ReST AND PATIENTECH'S COUNTERCLAIMS

### A.  Counterclaims for Fraud and Negligent Misrepresentation

231.  Respondents' theories of fraud and negligent misrepresentation have evolved over time.  In their post-hearing brief, Respondents focused on three alleged misrepresentations: (1) the acquisition would occur unless ReST got greedy or changed the terms; (2) Purple misrepresented the status of due diligence; and (3) Purple misrepresented its plans and intentions regarding the 2020 Bed (aka ReST + Purple or Purple-Enhanced ReST Bed), which induced ReST to launch it. (Respondents' Opening Post-Hearing Brief at 2-4, 13-15.)  I find that Respondents have not met their burden of proving their claims under any of these theories.

### 1.  Deal Would Close Unless ReST Got Greedy or Changed its Terms

232.  As Respondents note, Mr. Megibow testified that he repeatedly told Mr. Golden that the M&A deal was "yours to lose" and that the deal would close unless "you get greedy or change the game."  (Respondents' Opening Post-Hearing Brief at 2.)  Respondents assert that those representations were false and that they reasonably relied on them to assume that the deal would close unless they unreasonably demanded more money or changed the basic deal terms. Respondents further assert that Purple ultimately backed out of the deal for different reasons.

233.  I reject this misrepresentation claim for several reasons.  First, Mr. Megibow's statements must be viewed in the context of the MSA, which defines the Parties' contractual rights and obligations.  The MSA explicitly states that ███████████████████████████ ████████████████████████████████  (MSA, § 11.6.)

234.  Second, as discussed above, Mr. Megibow and Mr. Golden agreed in March 2020 that they would try to reach a "go/no go" decision by the summer of 2020, instead of continuing negotiations until January 2021.  That agreement makes clear that Mr. Golden understood that the acquisition was not guaranteed.  In fact, a major purpose of the March 2020 modification was to set forth "Plan B" options if the deal did not go forward.  Accordingly, I find that Respondents have not shown that they "reasonably relied" on Mr. Megibow's statements to assume that the deal would, in fact, be closed.

235.   Third, as Purple has noted, Mr. Megibow's statements did not concern presently existing facts.  Rather, they involve "future intended performance," which supports a fraud claim only if the plaintiff proves that "the presentor, at the time of the representation, did not intend to perform the promise and made the representation for the purpose of deceiving the promisee." (Purple's Opening Post-Hearing Brief at 8, quoting *Andalex Res., Inc. v. Myers*, 871 P.2d 1041, 1047 (Utah Court of Appeals 1994).)

236.   Fourth, I find that Mr. Megibow gave credible testimony that he honestly believed that the deal would happen until at or shortly before the August 5, 2020 meeting where the Purple Board decided not to proceed.   Mr. Megibow recognized that the deal presented multiple challenges, but testified credibly that he believed that the challenges could be overcome and was working hard to do so.  While ████████████████████████████████████ ████████████  Respondents have not proven that Mr. Megibow made intentionally false or negligent misrepresentations to Mr. Golden before that meeting.

237.   ReST and PatienTech argues that an internal Purple email that was inadvertently copied to them on April 9, 2020 (the "**April 9 Email**") is a "smoking gun" that shows that Purple had "serious doubts" about the acquisition.  That email states:



(Ex. 36.001.)

238.   The April 9 Email, however, does not state that Purple did not intend to complete the deal.  Rather, it merely notes that Purple is not "100% sure" that the deal will proceed.  Further, the basic concern of the email is to keep the project from "going off the rails," *i.e.*, to keep it on track.

239.   Significantly, ReST and PatienTech received a copy of the April 9 Email.  Thus, they knew that Purple had concerns about the deal, which is not surprising in a project of this size. Indeed, Mr. Golden said that "the red lights started flashing" when he received the April 9 Email. (Day 3 Hearing Tr. at 107:25 to 108:5.)

240. ReST and PatienTech rely on Mr. Megibow's subsequent text message stating that the April 9 Email was "way off base" and that he is "100% behind making this work." (Exs. 224, 2164.) Mr. Megibow emphasized, however, that there was no "guarantee":

> Your baby, that you created and cherish, I'm smitten with too. And I am making big bets to go the distance with you and your baby. ***It's not a guarantee of course**, which as I've been saying lately is more on you than me*, but I have cash I've handed to you and a ton of work I've invested into this, because of our commitment. My ask is that you don't let one immature employee blow this opportunity for both of us. There is still something amazing to do here. And as we've said lately as partners. You and I can make this happen. Especially if I can get you to trust that I have some amazing talent, like James, who can add some incremental value to your vision.

(Ex. 2164.002 (emphasis added).)

241. ReST and PatienTech recognize that the deal was not guaranteed, but argue that Purple misrepresented the "likelihood" of the deal proceeding. (Respondents' Opening Post-Hearing Brief at 3-4.) Statement regarding "likelihood," however, are inherently uncertain and leave open the possibility that the deal would not be completed. Further, I find that Mr. Megibow genuinely believed that the acquisition would likely be completed and worked hard to make it happen. Thus, ReST and PatienTech have not proven intentionally false or negligent misrepresentations regarding the likelihood of the deal going forward.

## 2. Status of Due Diligence

242. ReST and PatienTech claim that Purple falsely represented that due diligence was proceeding, when it fact Purple "stalled" the due diligence process for "over a month and a half," from late April to mid-June 2020. (Respondents' Opening Post-Hearing Brief at 4.) Purple argues that this a new theory that was not properly pled, and which fails on the merits in any event.

243. I find that the alleged "stall" in due diligence does not support a fraud or negligent misrepresentation claim. Respondents' own allegations indicate that this pause ended in June 2020, which was well before the MSA was terminated in August 2020. Further, even if there were a short pause, other work related to the potential acquisition continued. Because I reject this claim on its merits, I need not consider whether it was properly pled.

### 3.    Purple's Plans Regarding the 2020 Purple-Enhanced ReST Bed

244.    ReST and PatienTech claim that Purple falsely represented "Purple's intentions and plans for the 2020 Bed."  (Respondents' Opening Post-Hearing Brief  at 13.)  They assert that "Purple represented that the 2020 Bed would be a long-term product, intended to remain on the market as long as it performed."  (*Id.* at 13-14.)  They contend that Purple failed to disclose that it actually intended to sell only a few hundred units for a few months.  (*Id.* at 13-14.)

245.    Purple argues that (a) this is a new theory that ReST and PatienTech did not plead before the merits hearing; and (b) this new theory fails on its merits for several reasons, including that ReST and PatienTech have not proven, by clear and convincing evidence, a false statement on which they reasonably relied.  (Respondents' Opposition to Post-Hearing Brief at 2, 9-10).

246.    I agree that ReST and PatienTech have not met their burden of proof; thus, I need not address the threshold issue of whether they properly plead their new theory.  ReST and PatienTech do not cite any evidence that Purple "represented that the 2020 Bed would be a long-term product, intended to remain on the market as long as it performed."  Instead, they attempt to infer such a representation from other evidence, such as:

- Lloyd Sommers' testimony that it is "not the norm" for beds to come out as "limited editions or seasonal editions," especially for beds sold through dealers who would need to arrange for floor space; or for beds provided to affiliates to write reviews, which could take months (Day 5 Hearing Transcript at 136:21 to 137:12-18, 139:14-140:9; *see* Ex. 2473, 2298);

- Purple's March 2020 projection that ███████████████████████ ██████████████████  (Exs. 2455, 34);

- An April 2020 ReST document that referred to ████████████████████ ████████████████;

247.    The evidence cited by ReST and PatienTech does not show that Purple represented that the 2020 Bed would be "a long-term product" that would "remain on the market as long as it performed."  Rather, they show modest estimates of initial product sales that would focus on Direct-To-Consumer ("DTC") sales, with dealer sales following after several months.  The reference to "initial product volume" in the April 2020 ReST document is not a representation by Purple that this would be a "long-term product."

248.   Further, Mr. Megibow's statement to the Purple Board that the ███████████ ███████████████████████ (Ex. 2311.001) is not clear and convincing evidence that Purple intended to stop sales after a few months.  Mr. Megibow did not state that this was a long-term forecast for total sales over the life of the product.  Read in context, Mr. Megibow may have been referring to a short-term forecast.

249.   Moreover, the March 2020 Modification precludes ReST and PatienTech from proving that they reasonably relied on an alleged representation that the 2020 ReST Bed would be a long-term product, even if the deal did not proceed.  One of the key reasons for that modification was Mr. Golden's concern about launching the 2020 Bed as an exclusive ReST product, without either (a) assurance that the acquisition would occur; or (b) a long-term supply agreement for Purple Grids, so ReST could continue to sell the 2020 Bed even if the deal did not proceed.

250.   Despite this concern, ReST proceeded to launch the 2020 Bed in July 2020, without receiving Purple's guarantee that the deal would proceed and without executing a long-term supply agreement for Purple Grids.  When Mr. Golden was asked why he did not insist on a long-term supply agreement as a condition precedent to launching the 2020 Bed, Mr. Golden was unable to provide a persuasive explanation.

251.   Mr. Golden alleged that he "pushed and pushed and pushed" for a supply agreement, but was told:  "There's nothing to worry about.  Everything's going to be okay.  You're going to be supplied.  There's going to be an acquisition."  (Day 7 Hearing Tr. at 261:18-23.)  Mr. Golden testified that he "relied on the good faith and honest disclosures of Purple that those statements were true."  (*Id.* at 261:23-25.)  Mr. Golden admitted that he did not send a draft supply agreement to Purple before the deal fell apart, but alleged that "we had a supply agreement, a verbal one – and a commitment that we were going to be supplied."  (*Id.* at 263:20-25.)

252.   Mr. Golden's attempt to establish a verbal supply agreement and commitment from Purple is precluded by my order on Purple's Motion for Sanctions, which struck all claims and arguments related to the forged March 3 Email and related supply agreement.  (Procedural Order No. 25, ¶¶ 14-21.)  That order struck not only Respondents' counterclaim for breach of an alleged supply agreement, but also the portions of their fraud and negligent misrepresentation counterclaims that "are based on Purple's alleged representations about supplying Purple Grids to ReST."  (*Id.*, ¶ 14.)  Mr. Golden is effectively attempting to revise a claim that has already been stricken and that Respondents voluntarily withdrew.

253.    Even if this claim had not already been stricken, I find that Mr. Golden's allegation that there was an oral supply agreement is not credible.  On March 3, Mr. Megibow told Mr. Golden that if the deal did not proceed, the second Plan B option would be: ███████████ ██████████████████████████████████████████████████████████████████████████ (Ex. 1013.001 (emphasis added).)  That statement makes clear that there was no supply agreement. Moreover, Mr. Golden replied that all Plan B options were "workable," without asserting that the Parties already had an oral supply agreement.  (*Id.*)

254.    Given that there was no supply agreement, I find that ReST and PatienTech knowingly assumed the risk that they would be unable to continue sales of the 2020 Bed if the deal did not proceed and they could not agree on the terms of a long-term supply agreement.

### B.    Counterclaim Based on the Ad Spend Agreement

255.    ReST contends that Purple breached the Ad Spend Agreement, which Purple and ReST entered into as of June 30, 2020.  (Ex. 2.)  The Ad Spend Agreement requires ██████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████  (Ad Spend Agreement. §§ 1.3, 1.8, 1.9, 1.16).

256.    Section 1.16 of the Ad Spend Agreement states:

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

257.    The Ad Spend Agreement states ██████████████████████████████████████ ████████████████████████████  (Ad Spend Agreement, §§ 1.33, 1.34.)

258.    ReST asserts that it spent at least ████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████  (ReST's Opening Post-Hearing Brief at 21; citing Exs. 2441.02 and 2474.)  ReST clarified during closing arguments that it received a █████ payment for July, so its claim is limited to August to October.  (Day 10 Transcript at 174:6-12.)

259.   ReST claims damages of $575,000, arguing that if Purple had provided Ad Spend reimbursements, ReST would have spent more, which would have increased its sales and hence its profits by a "multiplier" of 21.3.  (ReST's Opening Post-Hearing Brief at 21; citing Ex. 284.14.)

260.   Purple opposes ReST's claim on several grounds, including that (a) ReST has not shown that it had the capacity to sell more ReST + Purple beds, especially after the MSA was terminated in August, when ReST had a backlog of orders that it could not fulfill; (b) ReST's 21.3 multiplier lacks sufficient factual support; (c) ReST is not entitled to Ad Spend after the MSA was terminated on August 11, 2020, especially in view of an August 12 email that confirmed that Purple had suspending Ad Spend payments; and (d) if ReST had actually sold more ReST _ Purple beds after the MSA was terminated, ReST would have had to make larger payments to Purple for trademark infringement or Revenue Share.

261.   I find that ReST is entitled to Ad Spend reimbursements until the MSA was terminated on August 11, but not after that date.   The Ad Spend agreement is separate from the MSA, but they are closely related.  Termination of the MSA logically implies termination of the Ad Spend Agreement.  Further, Purple notified ReST on August 12 that it was suspending Ad Spend payments, as evidenced by Kyle Taylor's confirming email of that date.  (Ex. 41; *see* Day 6 Transcript at 209:2 to 210:12 (Kyle Taylor testimony about Ex. 41.)

262.   ReST admittedly received an Ad Spend payment for July 2020.  Thus, ReST's Ad Spend claim is limited to August 1 until the August 11 termination of the MSA.

263.   I find that ReST damage theory based on a 21.3 multiplier is speculative and unreliable.  Instead, I will award damages based on the pro rata share of the reimbursement ReST should have received for August 2020 (*i.e.*, 11/31 of the monthly reimbursement).

264.   ReST spent ███████████████████████████████ in Minimum Services that was ReST's responsibility.  Accordingly, ReST is entitled to a pro rate Ad Spend payment of 11/31 × $15,980, or $5,670.32.

## C.    Counterclaim for Unreimbursed Costs of Consulting Services

265.   Before the merits hearing, Respondents ReST and PatienTech asserted that they were entitled to reimbursement for the cost of the consulting services that they provided to Purple for which they had not been reimbursed.  Respondents relied on claims for promissory estoppel and unjust enrichment.

266.   During the merits hearing, however, Mr. Golden clarified that Respondents are not making an affirmative damages claim for reimbursement for their costs; rather, they rely on their unreimbursed costs solely as an "offset" to Purple's claim for return of the initial ██████ payment.  (Day 7 Transcript at 192:10-16.)

267.   I have rejected Purple's claim for return of its initial payment of ██████.  Therefore, I need not consider Respondents' argument that they are entitled to an "offset" against an amount that has not been awarded.  To the extent that argument is deemed to be a "claim," it is denied as moot.

## VI.   DISPOSITION AND SCHEDULE FOR FURTHER SUBMISSIONS

268.   For the reasons set forth above, I rule as follows on Purple's claims:

A.   Purple's claim for return of its initial payment of ██████, minus the value of services and goods received, is DENIED.

B.   Purple's claim for Revenue Share payments is GRANTED IN PART.  I rule that Respondents ReST and PatienTech are jointly and severally liable for Revenue Share payments of $1,256,598 plus $67,703, or a total of $1,324,301.  To the extent that Purple seeks additional payments, Purple's claim for Revenue Share payments is DENIED.

C.   Purple's claim that ReST infringed its trademarks during the Pre-TRO Period is GRANTED IN PART.  I rule that ReST infringed Purple's trademarks by using them on its website and in other marketing materials from October 1 to December 13, 2020 to promote the ReST + Purple bed, even though ReST stopped selling that product in September 2020.  ReST is liable to Purple for damages of $230,119 to compensate for that infringement.  To the extent that Purple seeks additional damages for the Pre-TRO Period (such as damages for alleged infringement from August 11 to September 30, 2020, or enhanced or punitive damages), Purple's trademark infringement claim is DENIED.  Purple's trademark infringement claim is also DENIED to the extent that it is asserted against Respondent PatienTech and Respondent Golden.

D.   Purple's claim that ReST infringed its trade dress during the Post-TRO Period is GRANTED IN PART.  I rule that ReST infringed Purple's trade dress by using an image of a purple-colored grid to promote its ReST Bed with ReST GelGrid

that was virtually identical to the image that it had previously used to promote the ReST + Purple bed.  I also rule that ReST is liable to Purple for damages of $434,363 to compensate for that infringement.  To the extent that Purple seeks additional damages (such as enhanced or punitive damages), Purple's claim for trade dress infringement during the Post-TRO Period is DENIED.  Purple's trade dress infringement claim is also DENIED to the extent that it is asserted against Respondent PatienTech and Respondent Golden.

E.  Purple's other IP Claims are DENIED AS MOOT because they are duplicative of Purple's trademark and trade dress infringement claims, and Purple cannot recover the same damages more than once.

F.  Purple has withdrawn other claims that were previously asserted.  For the avoidance of doubt, any and all other claims and requests for relief of Purple are DENIED, except as granted above or as subject to the further submissions described below.

269.  For the reasons set forth above, I rule as follows on the counterclaims of Respondents ReST and PatienTech:

A.  The counterclaims of Respondents ReST and PatienTech for fraud and negligent misrepresentation are DENIED.

B.  The counterclaim of Respondent ReST for breach of the Ad Spend Agreement is GRANTED IN PART.  I rule that Purple is liable to ReST for $5,670.32.  To the extent that ReST seeks additional damages on this counterclaim, it is DENIED.

G.  The argument of Respondents ReST and PatienTech that they are entitled to an offset against Purple's claim for return of its initial investment of $4 million is DENIED AS MOOT.  I have denied Purple's claim for return of its initial investment, so there is no award against which an offset could be applied.

H.  Respondents ReST and PatienTech have withdrawn other counterclaims that were previously asserted.  For the avoidance of doubt, any and all other counterclaims and requests for relief of Respondents ReST and PatienTech are DENIED, except as granted above or as subject to the further submissions described below.

270.   For the reasons set forth above, my preliminary inclination is to deny the Parties' claims related to pre and post-award interest.   However, I will allow the Parties to make further arguments on this subject in connection with their submissions on allocation of fees and costs.

271.   Pursuant to Rule 40 of the AAA Rules, the hearing is hereby REOPENED for the limited purpose of further proceedings on allocation of fees and costs and pre and post-award interest.  The Parties shall make concurrent submissions on these issues on or before January 5, 2024.  The submissions shall include an argumentative brief of no more than 10 pages.  The Parties should address how fees and costs should be allocated, in view of the degree of success of each side on each of the claims and counterclaims, the conduct of the Parties during the arbitration, and other factors that the Parties consider to be relevant.

272.   The Parties may also include a separate summary of fees incurred by month, with a high-level description of the primary activities in each month, and a table showing the total hours worked each month by timekeeper, the billing rate, and the total fees incurred by each timekeeper. The separate summary shall also describe costs incurred each month.  Given that I have accepted some claims and rejected others, the Parties may wish to provide an estimate of the fees incurred on the claims on which they prevailed.

273.   Purple's summary should exclude the fees and costs that were already awarded by Procedural Order No. 25.  However, both sides may address the extent, if any, to which the conduct that is the subject of Procedural Order No. 25 is relevant to the allocation of other fees and costs.

274.   The Parties may address pre and post-award interest, but any request for an award of interest should explain why this issue was not addressed previously and why there is good cause to address it now.  Any such request should also address the applicable rate and time period, and provide supporting calculations.  The Parties may submit a limited number of supporting legal authorities, but I do not consider a large number of legal authorities to be necessary.

275.   After reviewing the Parties' further submissions, I will close the hearing and issue a Final Award that resolves all issues, including interest and allocation of fees and costs.

I hereby certify that this Interim Award is made in Utah as of December 15, 2023.

_____
Grant L. Kim, Arbitrator