AMERICAN ARBITRATION ASSOCIATION
Case No. 01-21-0016-3751

| | |
|---|---|
| PURPLE INNOVATION, LLC, | ) |
| | ) |
| Claimant and Cross-Respondent, | ) |
| | ) |
| vs. | ) |
| | ) |
| RESPONSIVE SURFACE TECHNOLOGY, LLC; PATIENTECH, LLC; and ROBERT GOLDEN, | ) |
| | ) |
| Respondents and Counterclaimants. | ) |

**PROCEDURAL ORDER NO. 25**
**(Order on Purple's Motion for Sanctions and**
**Respondents' Motion to Withdraw Counterclaims and Allegations)**

**A.  PROCEDURAL HISTORY**

1. This Order addresses the Motion for Sanctions that Claimant Purple Innovation, LLC ("**Claimant**" or "**Purple**") submitted on May 19, 2023 ("**Motion for Sanctions**"), as well as the related Motion to File Amended Counterclaims Withdrawing Allegations and Claims ("**Motion to Withdraw Counterclaims**"), which Respondents Responsive Surface Technology, LLC, Patientech, LLC, and Robert Golden (collectively, "**Respondents**") filed on June 20, 2022.

2. On May 22, 2023, I issued Procedural Order No. 20, which ordered Respondents to show cause as to why sanctions should not be imposed in view of Respondents' reliance on an email dated March 3, 2020 that Purple contended was a forgery (the "**March 3 Email**"). Respondent Robert Golden, the founder and CEO of both Respondent Responsive Surface Technology ("**ReST**") and Respondent Patientech, LLC ("**Patientech**"), testified at his deposition that the March 3 Email showed that he sent a document called Verbal Supply and Marketing Agreement Terms ("**Supply Agreement**") to Purple's principal, Joseph Megibow. Purple submitted an Expert Report from Scott Polus ("**Polus Report**"), a forensic expert, who concluded from his analysis of metadata that the March 3 Email had been created by altering a completely different email that Mr. Golden sent to Mr. Megibow on May 5, 2020.  (*See* Procedural Order No. 20, ¶¶ 2-3.)

1

3. Purple requested imposition of the following sanctions, as noted in paragraph 5 of Procedural Order No. 20:

- Dismissal with prejudice of all of Respondents' counterclaims;

- An award of liability on Purple's claims, subject to proof as to the amount of damages; and

- An immediate order "finding Purple is entitled to its fees and costs incurred in bringing this motion and investigating ReST's improper conduct, to be immediately payable but without prejudice to Purple's request for all fees." [1]

4. Procedural Order No. 20 (paragraph 9) ordered Respondents to show cause why the following relief should not be granted, with supporting evidence and legal authorities:

- Dismissal with prejudice of Counterclaim 2 in Respondents' March 27, 2023, Amended Statement of Counterclaims ("**Amended Counterclaims**"), which is called "Breach of Contract – Supply Agreement," either as a sanction for relying on false evidence, or for the reasons in the Motion for Summary Judgment Dismissal of Claims Based on Verbal Supply Agreement that Purple submitted on April 24, 2023, with its request for leave to file that motion;

- Dismissal with prejudice of Amended Counterclaims 1 and 3-10;

- An award of liability on Purple's claims, subject to proof as to the amount of damages; and

- An immediate award of fees and costs that Purple has incurred in connection with its Motion for Sanctions and related investigation.

5. Procedural Order No. 20 (paragraph 10) also ordered Respondents to provide "a declaration signed by Mr. Golden under penalty of perjury that provides a true explanation of when and how Mr. Golden became aware and came into possession of the Disputed Email, and why Respondents did not produce or mention the Disputed Email before Mr. Golden's deposition."

---

[1] Motion for Sanctions at 29.

6.	Respondents stated in their June 5, 2023, Response to Order to Show Cause ("**OSC Response**") that they "accept[] the conclusions of the Polus Report," "take[] responsibility" for their actions, and "apologize[] to the Arbitrator and to Purple" for the March 3 Email.  (OSC Response at 1-2.)  Respondents also agreed that "some sanctions are appropriate" for "the production and citation of the March 3 Email" and stated that they had withdrawn their claim for breach of the verbal supply agreement, as well as any related portion of their claim for breach of the implied covenant.  (OSC Response at 1-2.)  Respondents asserted, however, that it would not be appropriate to enter an award in favor of Purple on Purple's claims and Respondents' other counterclaims, as those claims and other counterclaims were not related to the March 3 Email.

7.	Respondents did not submit a declaration from Mr. Golden.  Instead, they requested relief from the requirement to submit a declaration, given that they did not contest the Polus Report or the factual basis for Purple's Motion for Sanctions.  (OSC Response at 2 n.1.)

8.	Purple submitted a Supplemental Brief in support of its Motion for Sanctions on May 28, 2023, and submitted a Reply to Purple's OSC Response on June 12, 2023.  In addition, Purple submitted a summary of the fees and costs they had incurred in connection with the Motion for Sanctions and its related Motion for Summary Judgment on Respondents' Supply Agreement counterclaim on June 2, 2023.

9.	A hearing on the Motion for Sanctions was held by videoconference on June 15, 2023, which also addressed case management issues.  I stated at the hearing that Respondents' submission of forged evidence was a very serious matter that warranted the imposition of sanctions, including the striking of all counterclaims, defenses, and allegations related to the fake March 3 Email, as well as an order requiring Respondents to reimburse Purple immediately for its related fees and costs.  I also directed the Purple and Respondents (collectively, the "Parties") to take the following additional actions, as stated in Procedural Order No. 23:

- On June 20, 2023, Respondents shall submit a motion to withdraw counterclaims and allegations in their Second Amended Counterclaims that they are no longer pursuing (including withdrawal due to the Motion for Sanctions and withdrawal for other reasons);

- Also on June 20, 2023, Purple shall submit a summary of additional fees and costs incurred in connection with its Motion for Sanctions that were not included in its June 2, 2023 summary;

3

- On June 22, 2023, Purple shall submit any comments on Respondents' motion to withdraw counterclaims and allegations, and Respondents shall submit any comments on Purple's supplemental summary of fees and costs;

- The Parties shall arrange for a supplemental deposition of Robert Golden regarding the fake evidence that is the subject of the Motion for Sanctions, and should also confer about how to ensure that Purple receives adequate information about who was involved in creating fake evidence and whether any other fake evidence was produced; and.

- The Parties shall submit a joint letter brief about the crime-fraud exception to attorney-client privilege and any other unresolved disputes.

10. The Parties made submissions on June 20 and 22 in accordance with the above schedule. The Parties submitted a joint letter brief about the crime-fraud exception on June 28.

11. Having considered all submissions to date, I make the following findings and rulings on Purple's Motion for Sanctions and Respondents' Motion to Withdraw Counterclaims.

B. **PURPLE'S MOTION FOR SANCTIONS**

12. As noted above, Respondents do not dispute the content of the Polus Report or that some sanctions are appropriate in view of their production and reliance on the fake March 3 Email. Respondents do oppose, however, some of the sanctions requested.

13. My analysis of Purple's Motion for Sanctions is divided into four sections: (1) Purple's request to dismiss Respondents' counterclaims and allegations that are related to the March 3 Email; (2) Purple's request to dismiss Respondents' counterclaims that are not related to the March 3 Email and for a ruling on liability on Purple's claims against Respondents; (3) Purple's request for an order requiring immediate payment of some of the fees and costs that Purple has incurred; and (4) other relief related to the March 3 Email.

1. **Counterclaims and Allegations Related to the March 3 Email**

14. Respondents do not dispute that their counterclaims and allegations related to the March 3 Email and the related "Supply Agreement" should be withdrawn. Indeed, Respondents have filed a motion to withdraw those counterclaims and allegations, including:

- Respondents' Second Counterclaim for Breach of Contract -- Supply Agreement; [2]

- Respondents' Fifth Counterclaim for Tortious Interference with Contract; [3]

- The portions of Respondents' Sixth Counterclaim for Fraud and Seventh Counterclaim for Negligent Misrepresentation that are based on Purple's alleged representations about supplying Purple Grids to ReST; [4]

- The portion of Respondents' Eighth Counterclaim for Promissory Estoppel that is based on Respondents not needing to be concerned about supply of Purple Grids. [5]

- The portions of Respondents' Tenth Counterclaim for Breach of the Implied Covenant of Good Faith and Fair Dealing that is based on the alleged Supply Agreement; [6]

- Allegations and requests for relief in other sections of Respondents' Amended Counterclaims that relate to the above claims and the supply of Purple Grids. [7]

15. Respondents' withdrawal of some of their counterclaims and allegations arguably moots Purple's Motion for Sanctions to the extent that it seeks to strike those specific counterclaims and allegations. However, in view of the egregious nature of the conduct at issue, I consider it appropriate to make formal factual findings and rulings related to the March 3 Email and the related counterclaims.

16. I find that the Polus Report, the other evidence submitted by Purple, and the admissions of Respondents establish the following facts:

---

[2] Exhibit 297, Respondents' Proposed Amended Counterclaims (Redline), at 8-9.

[3] *Id.* at 11.

[4] *Id.* at 13-15.

[5] *Id.* at 15.

[6] *Id.* at 16.

[7] *Id.* at 1, 3-5, 7-8, 17. Purple's argument that additional allegations related to the Supply Agreement should be stricken is discussed in Section C below.

5

- The March 3 Email is a forgery that was created by altering a different email that Mr. Golden sent to Mr. Megibow on May 5, 2020.

- Mr. Golden gave false testimony about the March 3 Email at his deposition on April 14, 2023 ("April 14 Golden Depo."). For example, Mr. Golden falsely testified that he sent the Supply Agreement to Mr. Megibow in early March by email; that Mr. Golden and Mr. Megibow then discussed the Supply Agreement; and that Mr. Golden has a copy of the March 3 Email in his files. (April 14 Golden Depo. at 32:20 to 34:16.) After the March 3 Email was produced during the deposition, Mr. Golden testified about the email as if it were authentic, without disclosing that it is fake. (April 14 Golden Depo. at 38:13 to 43:6.)

- Given that the March 3 Email identifies Mr. Golden as the sender, Mr. Golden must have known when he testified that the March 3 Email was fake and that he never sent any such email to Mr. Megibow. In addition, Mr. Golden either created the March 3 Email by deliberately altering his May 5 email to Mr. Megibow, or by asking someone else to do this.

- Given that Mr. Golden is the CEO of Respondents ReST and Patientech, I find that all Respondents knew that the March 3 Email was fake, yet proceeded to produce and rely on it.[8]

17. I also find that Respondents relied on the fake March 3 Email in opposing Purple's request for leave to file a summary judgment motion on Respondents' claim for breach of the Supply Agreement. Respondents asserted that the March 3 Email and the attached Supply Agreement constituted a written confirmation of an oral supply agreement that satisfied the Utah Statute of Frauds. (Respondents' May 2, 2023 Opposition to Motions for Leave to File Motions for Summary Judgment, at 13-14.)

18. I relied on the March 3 Email in denying Purple's request to file a summary judgment motion. I found that Purple had provided "reasons to question" whether the Parties had actually entered into a Supply Agreement, but that the March 3 Email constituted "prima

---

[8] In contrast, I find that there is no evidence that Respondents' counsel knew that the March 3 Email was fake before it received the Polus Expert Report and Purple's Motion for Sanctions. I note in this regard that Respondents' current counsel substituted in as counsel in March 2023, and that Purple's counsel stated at the June 15 hearing that Purple had no reason to suspect that Respondents' current counsel had prior knowledge that the evidence was fake.

facie" evidence that the Statute of Frauds did not apply and that there were disputed factual issues that were not appropriate for summary judgment. (Procedural Order No. 19, ¶¶ 25-28.) I likely would have granted Purple's motion for summary judgment if Respondents had not submitted the March 3 Email or I had known that it was fake.

19. I find that Respondents' production of and reliance on the fake March 3 Email is egregious and deliberate misconduct that warrants the imposition of sanctions, including dismissal of Respondents' counterclaims and allegations related to the March 3 Email and the alleged Supply Agreement. I do not need to rely on sanctions, however, because dismissal those counterclaims and allegations is warranted for two other reasons.

20. First, Respondents have themselves moved to withdraw their counterclaims and allegations related to the March 3 Email.

21. Second, Respondents' only defense to summary judgment based on the Statute of Frauds was that the March 3 Email is a written confirmation of an alleged oral agreement that meets the requirements of Utah Code Section 70A-2-201(b). (Respondents' May 2, 2023 Opposition to Motions for Leave to File Motions for Summary Judgment, at 13-14.) Respondents' admission that the March 3 Email is fake eliminates that defense. Thus, even if Respondents had not moved to withdraw counterclaims and allegations related to the March 3 Email, Purple would be entitled to summary judgment on the ground that the Utah Statute of Frauds bars Respondents' claims based on the alleged Supply Agreement.

### 2. Claims, Counterclaims, and Allegations Not Related to the March 3 Email

22. Purple contends that Respondents' reliance on fake evidence is such serious misconduct as to warrant dismissal of Respondents' counterclaims that are not based on the March 3 Email and related Supply Agreement. Purple also contends that a ruling on liability should be entered in favor of Purple on its claims against Respondents, with a "prove-up hearing" limited to damages.

23. I agree that deliberately creating fake evidence is extremely serious misconduct. I also agree that deliberate creation of fake evidence may, in some cases, warrant the extreme sanction of case-terminating sanctions, even as to claims and counterclaims that are not related to the fake evidence. I decline to enter such sanctions at this time, however, in view of the following factors: (a) the fake nature of the March 3 Email does not directly affect the merits of unrelated claims and counterclaims; (b) while arbitrators likely have the power to impose case-

7

terminating sanctions as to unrelated claims and counterclaims, the Parties have not cited legal authorities that are directly on point, so there is a risk of collateral disputes about the enforceability of an arbitral award based on such sanctions; (c) even if case-terminating sanctions were imposed as to all claims and counterclaims, a hearing would still need to be held; and (d) substantial other sanctions have been imposed and additional sanctions may be imposed in the future. I elaborate on each of these points below.

### a. The fake March 3 Email does not affect the merits of unrelated claims and counterclaims

24. As discussed above, Respondents have moved to withdraw their counterclaims and allegations that are directly related to the fake March 3 Email and the alleged Supply Agreement. The fake nature of the March 3 Email goes directly to the merits of those counterclaims, as it removes Respondents' only basis for arguing that the Statute of Frauds does not bar those counterclaims. Thus, it is clear that those counterclaims should be dismissed.

25. In contrast, Purple's claims and the counterclaims that Respondents have not withdrawn are not directly related to the March 3 Email or the alleged Supply Agreement. Those claims and counterclaims include:

- Purple's claim for ▮▮▮▮▮ of the Master Vendor Supply and Services Agreement ("**MSA**");

- Purple's claim for return of its ▮▮▮▮▮

- Purple's claims for trademark, trade dress, and patent infringement, as well as unfair competition, false advertising, and deceptive trade practices;

- Respondents' counterclaims based on the Ad Spend Agreement and unjust enrichment, as well as the portions of its counterclaims for fraud, negligent misrepresentation, and promissory estoppel that are based on Purple's alleged representation that it would negotiate ▮▮▮▮▮

26. None of the above claims or counterclaims are based on the March 3 Email or the attached Supply Agreement. Thus, Respondents' admission that the March 3 Email is fake does not directly affect the merits of those claims and counterclaims.

8

4864-1958-0780,

27. Purple argues that even though its claims and Respondents' other counterclaims are not "directly related" to the fake March 3 Email or the Supply Agreement, "the Forged Email was submitted to support all aspects of ReST's claims and defenses, and it is impossible to separate the Forged E-mail and related claims from the rest of the case." (Purple's June 12, 2023 Reply In Support of Motion for Sanctions at 6; *see* Purple's May 26, 2023 Supplemental Brief In Support of Motion for Sanctions at 3-5.) Purple emphasizes that a core element of Respondents' claims and defenses is that Purple engaged in a "long con" that included falsely assuring Respondents that Purple would continue to supply Purple Grids.

28. Respondents, however, have agreed to withdraw all allegations related to any agreement to supply Purple Grids. Respondents continue to allege that Purple made fraudulent misrepresentations, but has limited its allegations to promises to ██████████ ██████████████████████████████

29. In view of Respondents' withdrawal of their allegations related to the supply of Purple Grids, I currently believe that it should be possible to separate the fake March 3 Email from the merits of Purple's claims and Respondents' unrelated counterclaims. If, however, later developments show that this is difficult or impossible, Purple may apply for further relief then.

30. In theory, misconduct by a party related to one claim could be so severe as to warrant sanctions even as to unrelated claims and counterclaims. However, the showing needed to obtain such extreme sanctions would need to be far stronger than the showing to obtain sanctions as to related claims and counterclaims.

### b.   Risk of collateral disputes about case-terminating sanctions

31. A second consideration is that neither side has cited any legal authority that directly addresses whether an arbitrator may enter case-terminating sanctions as to claims and counterclaims that are not related to the misconduct at issue. Sanctions are authorized by the 2013 version of the Commercial Arbitration Rules of the American Arbitration Association ("**AAA Rules**"), which apply to this case, but the scope of that authority is not entirely clear.

32. Rule 58 of the AAA Rules authorizes imposition of "appropriate sanctions" when "a party fails to comply with its obligations under these rules or with an order of the arbitrator." Rule 58, however, limits that authority as follows:

> In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall

9

require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

33. Similarly, Rule 23 of the AAA Rules states, in relevant part:

The arbitrator shall have the authority to issue any orders necessary to enforce the provisions of rules R-21 and R-22 and to otherwise achieve a fair, efficient and economical resolution of the case, including, without limitation:

* * *

(d) in the case of willful non-compliance with any order issued by the arbitrator, drawing adverse inferences, excluding evidence and other submissions, and/or making special allocations of costs or an interim award of costs arising from such non-compliance.

34. Rules 58 and 23 authorize the imposition of sanctions such as adverse inferences, an interim award of costs, exclusion of evidence, or adverse determination of issues if a party willfully violates an order of the arbitrator or its obligations under the AAA Rules. Rule 58, however, prohibits entry of a "default award" as a sanction. Further, if a sanction is imposed that limits the participation of a party or results in adverse determination of an issue, Rule 58 requires "submissions of evidence and argument" before an award is issued.

35. I find that Respondents' production and reliance on the fake March 3 Email, and the false deposition testimony of Mr. Golden, are willful violations of Respondents' obligations under the AAA Rules. Respondents' obligation to produce "documents" in their possession or custody under AAA Rule 22 is limited to pre-existing documents created in the ordinary course of business. "Documents" do not include fake evidence. Further, Mr. Golden's false deposition testimony violated his oath to testify truthfully. Mr. Golden's false testimony and Respondents' production of false evidence also violate Procedural Order No. 1, which provides for document discovery, depositions, and dispositive motions. Engaging in discovery, depositions, and dispositive motions includes an obligation to produce genuine documents and to testify truthfully.

36. The question, however, is whether the AAA Rules authorize case-terminating sanctions as to claims and counterclaims that are not directly related to fake evidence and false testimony. Purple relies on a Central District of California case that confirmed an award in an AAA arbitration, which found the conduct of the respondent, NBRA, to be "so egregious as to warrant (if not require) the imposition of terminating sanctions." *Willick v. Napoli Bern Ripka & Associates, LLP*, 2:25-cv-652, 2018 WL 6443080, *1 (C.D. Cal. 2018), The district court found that the award was consistent with Rule 58 for the following reasons:

10

>AAA Rule 58 explicitly gives arbitrators the power to issue sanctions. The only limit the rule imposes is a prohibition on entering a "default award as a sanction." In this way, AAA Rule 58 reflects the process that applies for entering default judgment as a sanction in federal district court. A court may enter default judgment as a sanction, but it cannot impose a damages award as a sanction…. Rather, a plaintiff seeking default judgment carries the burden of proving damages…. Similarly, by allowing an arbitrator to impose an "adverse determination of an issue or issues" as a sanction, AAA Rule 58(a) permits determinative sanctions. But in proscribing "a default award as a sanction," AAA Rule 58(a) prevents arbitrators from automatically, without proof, providing the non-defaulting party an award. Instead of immediately granting a default arbitration award, the arbitrator must consider "evidence and legal argument prior to making ... an award." AAA Rule 58(a).
>
>Here, the Arbitrator did not enter a default award as a sanction. Rather, he struck NBRA's pleadings and entered default as a sanction. He then conducted a prove-up hearing, during which Plaintiff presented evidence and legal argument to support an ultimate arbitration award. Only after that prove-up hearing did the Arbitrator enter the Award. Thus, the Arbitrator made adverse determinations against NRBA as a sanction and then entered the Award based on evidence and argument. This conduct falls within the scope of the power granted to arbitrators under AAA Rule 58.

*Id.* at *3-*4 (citations omitted).

37. While *Willick* is helpful to Purple, it is subject to several limitations. First, the prove-up hearing in *Willick* appears to have included both liability and damages. The arbitrator "struck NBRA's answer and entered default," and "then scheduled a 'prove-up hearing' during which Plaintiff would be required to 'prove up all of his claims against [NBRA].'" *Id.* at *1 (fact citation omitted). At the hearing, "Plaintiff presented his evidence and argument to prove up all of his claims against [NBRA]." *Id.* at *2 (fact citation omitted). Those descriptions of the prove-up hearing are not limited to damages. Rather, they include "all" claims, which would appear to include liability, in addition to damages.

38. Second, as Respondents note, the arbitrator limited the prove-up hearing to the claims for an Accounting and Breach of Contract, which were the two claims to which the discovery misconduct that was the subject of sanctions "would have primarily related."[9] The Arbitrator explained:

---

[9] RL-3, Order July 3, 2018 Order re: Claimant's Motion for Terminating and Monetary Sanctions. at 16 (page 144 of Exhibit 13). It is not clear what happened to the claimant's other

11

> By limiting the default to only those two causes of action, the Arbitrator is limiting the notion of the imposition of a "penalty" or the suggestion that the entry of the default award is in some manner "inequitable." Moreover, it limits the Claimant's damages to contractual damages which would have been contemplated "had he obtained the discovery and it had been completely favorable to his cause."

39. Here, in contrast, Purple seeks sanctions that include favorable rulings on claims and counterclaims that are not directly related to the fake March 3 Email. Those sanctions would go well beyond those granted in *Willick*.

40. Purple asserts that Respondents' creation of fake evidence is far more serious than the misconduct in *Willick*. Purple also reliy on a Utah state court case that held that creating fake evidence warrants imposition of case-terminating sanctions, instead of the lesser sanctions that the special master had recommended. CL-13, Ruling Adopting Special Master's Report and Order of Sanctions, *Transfac Capital, Inc. v. Ashtin Transport, LLC*, Case No. 170904762, Utah Salt Lake County District Court (December 26, 2018).

41. I agree that Respondents' creation of fake evidence is far more serious than the misconduct in *Willick*, and that the Utah decision supports Purple. The Utah decision, however, did not address whether arbitrators can impose similar sanctions. *Willick* addressed that issue, but in the context of a prove-up hearing limited to claims related to the misconduct at issue.

42. A third limitation of *Willick* is that the respondent in that case apparently did not assert any counterclaims, so the prove-up hearing was limited to the claimant presenting evidence and argument to support its claims. If Respondents' counterclaims not related to the March 3 Email were dismissed, it is not clear what would happen at a prove-up hearing on those counterclaims, given that Respondents bear the burden of proving their counterclaims.

43. Neither Purple nor Respondents cite a case that addressed whether arbitrators may impose case-terminating sanctions as to claims or counterclaims that are not directly related to the misconduct. The cases they cite either involved claims that were related to the misconduct or that involved imposition of sanctions by a court rather than an arbitral tribunal.

44. Having reviewed the AAA Rules and the cases that the Parties have cited, I believe that arbitrators should have the power to impose case-terminating sanctions as to unrelated

---

claims, but the arbitrator stated that the claimant agreed to limit the prove-up hearing to the two claims related to the misconduct. *Id.* Thus, the claimant apparently agreed to drop his other claims and to limit the prove-up hearing to the two claims related to the misconduct.

claims and counterclaims in truly egregious cases. Given that the Parties have not cited any legal authority that is directly on point, however, imposing such sanctions would create a risk that Respondents would oppose enforcement of an arbitral award based on such sanctions. That factor alone does not compel the conclusion that such sanctions should not be imposed, but does counsel caution and is a factor that should be considered.

### c. A hearing would still need to be held even if case-terminating sanctions were imposed as to all claims and counterclaims

45. Another factor is that Rule 58 would require a prove-up hearing to be held even if case-terminating sanctions were imposed as to all claims and counterclaims. Further, as discussed above in connection with the *Willick* case, that hearing would likely need to include liability, in addition to damages. Such a hearing would require both sides to spend substantial time and money to prepare, to examine witnesses, and to present evidence and argument.

46. The fact that a hearing would need to be held is not sufficient, by itself, to compel the conclusion that case-terminating sanctions should not be imposed as to claims and counterclaims that are not related to the fake March 3 Email. It is, however, a factor to consider in evaluating whether case-terminating sanctions will promote the "fair, efficient, and economical resolution of the dispute," which AAA Rule 23 describes as the overall goal of imposing sanctions and issuing other enforcement orders. While case-terminating sanctions may result in a somewhat shorter and less expensive hearing, they may also give rise to collateral disputes about enforcement that may ultimately make it more expensive and time-consuming to achieve a final resolution of the dispute.

### d. Substantial other sanctions have been imposed and other relief may be granted

47. Another important factor is that I am imposing substantial sanctions and ordering other remedial measures, including:

- Striking all of Respondents' counterclaims and allegations related to the March 3 Email;

- Finding that Respondents deliberately created fake evidence and relied on that fake evidence to oppose summary judgment, and that Mr. Golden lied about that evidence at his deposition;

- Taking Respondents' deliberate creation of fake evidence into account in evaluating the credibility of Mr. Golden and other witnesses for Respondents;

- Ordering Respondents to reimburse Purple immediately for fees and costs related to the fake March 3 Email, and reserving the right to require Respondents to reimburse Purple for other fees and costs, as discussed below;

- Requiring a deposition of Mr. Golden and possibly other ReST witnesses, and reserving the power to impose other sanctions or to require Respondents to take other measures, as discussed below.

48. While these sanctions do not include unrelated claims and counterclaims, they do eliminate a large part of Respondents' case. In addition, Respondents will need to reimburse Purple immediately for fees and costs related to the fake March 3 Email. Further, the damage to Mr. Golden's credibility will make it harder for Respondents to prevail on other claims and counterclaims, especially as to issues where credibility is important. Collectively, these sanctions are substantial and make clear that creating fake evidence has immediate and severe consequences.

49. In view of all the factors noted above, I find that Respondents' deliberate creation and reliance on fake evidence is an extremely serious violation of Respondents' obligations under the AAA Rules and the orders in this case that warrants the imposition of sanctions. I also find that the fair, efficient and economical resolution will best be served by the other sanctions that have been imposed, without imposing case-terminating sanctions as to unrelated claims and counterclaims at this time. I reserve the power, however, to impose additional sanctions and to take other measures if warranted by future developments.

### 3. Immediate Payment of Fees Incurred by Purple In Connection with its Motion for Sanctions and Motion for Summary Judgment on Respondents' Supply Agreement Counterclaim

50. Purple has requested that Respondents be required to reimburse it immediately for the fees and costs it has incurred in connection with the fake March 3 Email. In response to Procedural Order No. 21, Purple submitted a summary of its total fees and costs as of June 2, 2023. Purple's summary and its related spreadsheet showed a total of $37,962 in fees and costs for work related to the fake email, including investigating the fake March 3 Email; preparing Purple's Motion for Sanctions and supplemental filings; preparing Purple's Motion for Summary

14

Judgment on Respondents' Supply Agreement claim, and its related request for leave to file the summary judgment motion; and $2,112.50 for the work of Purple's forensic expert, Scott Polus.

51. Pursuant to Procedural Order No. 23, Purple submitted a further summary of fees and costs on June 20, 2023. Purple submitted evidence that it had incurred $20,441 in additional fees related to the motion for sanctions, including work related to Respondents' OSC Response, Purple's Reply, the June 15 hearing, and Purple's fee summaries. Thus, Purple has claimed a total of $58,362 in fees and costs related to the fake March 3 Email.

52. Respondents do not dispute that an order requiring immediate payment of some of the fees and costs that Purple has incurred is appropriate. Respondents contend, however, that a portion of the fees should not be awarded. I conclude that all of the fees and costs claimed by Purple are sufficiently related to the fake March 3 Email to warrant an order requiring Respondents to reimburse Purple for those expenses. Accordingly, Respondents are ordered to make immediate payment to Purple of $58,362 by no later than July 7, 2023.

53. I note also that I will take Respondents' deliberate misconduct into account when allocating fees and costs at the end of this case.

### 4.   Other Relief Related to the March 3 Email

54. As noted above, Procedural Order No. 20 ordered Respondents to submit a declaration from Mr. Golden regarding the creation and production of the March 3 Email. Respondents requested relief from the requirement, suggested that this was mooted by the fact they did not contest the Polus Report or the factual basis for Purple's Motion for Sanctions. (OSC Response at 2 n.1.)

55. Purple argued in its Reply In Support of its Motion for Sanctions and at the June 15 hearing that Respondents' acceptance of the Polus Report did not eliminate the need to obtain an explanation from Mr. Golden.

56. As discussed at the June 15 hearing, Respondents' acceptance of the Polus Report means that they admit that the March 3 Email is fake and that Mr. Golden's related deposition testimony was false. That acceptance, however, does not moot the need for further explanation from Mr. Golden for at least two reasons.

57. First, while it is logical to infer that Mr. Golden was involved in the creation of the March 3 Email, it is not clear whether other persons assisted with its creation or knew that it was

15

fake. Purple has a legitimate need to know who else was involved because this bears on the credibility of the credibility of any other persons who knew that the March 3 Email was fake or who helped to create the fake evidence.

58.     Second, Purple has a legitimate need to know whether any other fake evidence was created by Mr. Golden or other Purple representatives.

59.     I asked at the hearing whether Purple would prefer to receive a declaration from Mr. Golden or to take his deposition. Purple said it would prefer to take his deposition. I understand that the Parties have scheduled Mr. Golden's deposition for July 7, 2023.

60.     Respondents' counsel noted at the June 15 hearing that there was a possibility that Mr. Golden might decline to answer some questions about the March 3 Email based on the Fifth Amendment. Counsel for Purple and Respondents agreed that if the Fifth Amendment were invoked, it would be proper to draw adverse inferences against Mr. Golden for use in this civil dispute. It was also noted, however, that if this were to occur, Purple may need to take discovery by other means to determine whether other representatives of Respondents knew about or assisted with the creation of the fake March 3 Email, as well as whether other fake evidence was created. Purple noted that it intended to file a motion requesting production of communications between Respondents and its former counsel (Snell & Wilmer) regarding the fake March 3 Email, on the ground that the crime-fraud exception to the attorney-client privilege applies.

61.     The Parties' filed a joint letter brief concerning the Crime-Fraud Exception on June 27, 2023. Respondents also submitted a declaration from Mr. Tracy Fowler of Snell & Wilmer.

62.     Also on June 27, Respondents' counsel noted that ReST has designated three other current of former ReST employees to testify as witnesses at the hearing. Counsel stated that Respondents would be willing to provide a declaration from each witness who will testify regarding their involvement (or non-involvement) in the creation or furnishing or use of that March 3 Email. Counsel also stated that if that is not sufficient, Respondents would be willing to arrange a series of short depositions with each of the witnesses.

63.     On June 29, Purple stated that it believed that declarations from all current or former ReST witnesses who will testify at the hearing regarding their involvement, if any, in the creation or furnishing of the March 3 email, in conjunction with Mr. Golden's deposition testimony on July 7, is sufficient on the issue of discovery from Respondents. Purple also noted some follow-up questions regarding Mr. Fowler's declaration.

16

64. I have requested that the Parties confer further on the above issues. Accordingly, I will not express any view on these issues until the Parties have completed their discussions. If the Parties cannot reach agreement, I am available to resolve any remaining disputes and may grant additional relief if I conclude that this is warranted.

### C. RESPONDENTS' MOTION TO WITHDRAW COUNTERCLAIMS AND ALLEGATIONS

65. As noted above, Respondents have moved to file amended counterclaims that withdraw counterclaims and allegations related to the March 3 Email and the alleged Supply Agreement. Respondents also seek to withdraw other counterclaims and allegations that they have decided not to pursue, including:

- Respondents' Third Counterclaim for Misappropriation of Trade Secrets;[10]

- Respondents' Ninth Counterclaim for Unfair Competition;[11] and

- Allegations in other sections related to those two counterclaims.[12]

66. Purple does not oppose withdrawal of the counterclaims and allegations that Respondents have identified. Purple asserts, however, that several additional allegations should be withdrawn because they relate to counterclaims that have been withdrawn. I discuss each of those additional allegations below, referring to the relevant page number.

67. **Page 7**: Respondents proposed to revise the following sentence on page 7 of their Amended Counterclaims by deleting the text that has been stricken out:

> Megibow also stated that Purple's board would no longer provide ReST the Purple Grids ~~at the agreed-upon prices, in violation of the Supply Agreement~~, and that Purple would no longer honor its reimbursement obligations under the Ad Spend Agreement

68. Purple proposes that the first part of the sentence ("Megibow also stated that Purple's board would no longer provide ReST the Purple Grids") should also be deleted.

---

[10] Exhibit 297, Respondents' Proposed Amended Counterclaims (Redline), at 9-10.

[11] Exhibit 297, Respondents' Proposed Amended Counterclaims (Redline), at 15-16.

[12] Exhibit 297, Respondents' Proposed Amended Counterclaims (Redline), at 1.

69. I agree that the reference to Purple no longer providing Purple Grids should be stricken. That reference concerns Respondents' withdrawn claim for breach of the supply agreement. Indeed, this sentence appears in a section titled, "Purple Breaches the Agreements." The statement about no longer providing Purple Grids has no relevance except to the withdrawn claim.

70. The first three words of the sentence ("Megibow also stated"), however, are needed for the following reference to the Ad Spend Agreement. Accordingly, the sentence should be amended as follows:

> Megibow also stated ~~that Purple's board would no longer provide ReST the Purple Grids at the agreed-upon prices, in violation of the Supply Agreement, and~~ that Purple would no longer honor its reimbursement obligations under the Ad Spend Agreement

71. **Pages 12 and 14**: Purple asserts that the following text on pages 12 and 14 should be deleted:

> Four days after that meeting, on December 16, 2020, CEO Megibow contacted Golden on behalf of Purple, and, upon information and belief, at the behest 
>
> Golden told Megibow that there

72. I find that this text is not especially relevant, given that Respondents have withdrawn their claim for misappropriation of trade secrets. However, the text does not allege any misappropriation of trade secrets and arguably has some relevance as general background. Thus, I will not require deletion of this text, but will not consider any claims or arguments by Respondents that Purple misappropriated any trade secrets. I also note that these are merely allegations. Not deleting this text does not imply that I am accepting the allegations as true.

73. **Page 15**: Purple proposes that the following highlighted text on page 15 should be deleted:



18

███████████████

74. I find that the highlighted text has no relevance to any issue in this case except to the trade secret misappropriation claim that Respondents have withdrawn. Accordingly, the highlighted text is stricken.

75. In sum, Respondents' Motion to Withdraw Counterclaims and Allegations is granted, except that Respondents shall delete the additional text on pages 7 and 15 that is identified above. Respondents shall submit a clean version of their Second Amendment Statement of Counterclaims that is consistent with their proposed amendments plus the additional deletions noted herein by July 7, 2023.

### D. CONCLUSION

76. For the reasons stated above, I grant Respondents' Motion to Withdraw Counterclaims and Allegations, with the following qualifications:

   A. In addition to withdrawing all counterclaims and allegations that Respondents have proposed to withdraw, Respondents shall also delete the additional text on pages 7 and 15 that is identified in paragraphs 70 and 73 above.

   B. Respondents shall submit a clean version of their Second Amendment Statement of Counterclaims that is consistent with this order by July 7, 2023.

77. For the reasons stated above, I grant Purple's Motion for Sanctions in part as follows:

   A. I find that Respondents deliberately created and relied on fake evidence and deliberately provided false deposition testimony, which is gross misconduct that warrants the imposition of sanctions.

   B. I strike all counterclaims and allegations related to the fake evidence, as identified in paragraph 14 above;

   C. Respondents are ordered to make immediate payment to Purple of $58,362 by no later than July 7, 2023, to cover fees and costs incurred by Purple that are related to the fake evidence and Respondents' misconduct;

19

    D.    Mr. Golden shall appear at a deposition regarding the creation of the fake March 3 Email and related issues, including (but not limited to) the extent to which other persons assisted in that creation or knew that the email was fake, and the extent to which any other fake evidence has been created in connection with this arbitration;

    E.    Respondents shall confer in good faith with Purple about other reasonable measures to ensure that Purple receives sufficient information to evaluate the credibility of other ReST witnesses and the extent to which other fake evidence was created.

78. I reserve the power to impose other sanctions and to grant other relief in the future, if I conclude that this is warranted.

Date: June 29, 2023

_____
Grant L. Kim, Arbitrator